**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CITY OF NEW YORK, CITY OF CHICAGO, CITY AND COUNTY OF SAN FRANCISCO, COUNTY OF SANTA CLARA, CITY OF SEATTLE, and MARTIN LUTHER KING JR. COUNTY,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, *in his official capacity as Secretary of Homeland Security*; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; and JOSEPH B. EDLOW, *in his official capacity as Director of United States Citizenship and Immigration Services*,

Defendants.

CIVIL ACTION NO. ______

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## TABLE OF CONTENTS

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** .................................. **1**

**INTRODUCTION** .................................................................................................... **1**

**JURISDICTION AND VENUE** .................................................................................. **8**

**PARTIES** .................................................................................................................. **9**

**LEGAL AND FACTUAL BACKGROUND** ................................................................ **11**

A. Federal Immigration Statutes Incorporated the Common Law Understanding of "Public Charge" as Primary Dependency. .................................. 11

1. Common Law Defines Public Charge as an Individual Primarily Dependent on the Government For Subsistence. ........................................................................................ 13

2. The Immigration and Nationality Act of 1952 Incorporated the Common Law Definition of Public Charge. ........................................................................................ 14

3. Congress Repeatedly Rejected Efforts to Expand Public Charge Beyond the Common Law Definition. ............................................. 16

B. The 1999 Guidance on Public Charge Codified the Primary Dependence Standard. ............................................................................ 19

C. The 2019 Public Charge Rule and Judicial Rejection of that Rule as Contrary to Law and Arbitrary and Capricious. .......................................... 23

D. The 2022 Public Charge Rule Restores and Codifies the Longstanding "Primary Dependence" Standard. ..................................................... 25

E. The 2025 Proposed Rulemaking. ............................................................... 26

F. The Final Rule. ........................................................................................... 27

G. The Policy Alert. ......................................................................................... 29

H. The Final Rule and Policy Alert Violate the Administrative Procedure Act. ........................................................................................... 33

1. The Final Rule and Policy Alert Are Contrary to Law and in Excess of Statutory Authority. ......................................................... 33

A) The Final Rule and Policy Alert Conflict with the Meaning of the Statutory Term "Public Charge" and Are Not in Accordance with Law. ... 33

B) The Final Rule and Policy Alert Incorrectly Conflate DHS's Misinterpretation of PRWORA with Public Charge. ... 36

2. The Final Rule and the Policy Alert Are Arbitrary and Capricious. ... 37

A) The Final Rule's Rescission of the 2022 Regulation Without Replacement Regulatory Text or Meaningful Limits Is Arbitrary and Capricious. ... 37

B) The Final Rule and the Policy Alert Are Arbitrary and Capricious Because They Rely on Defective Reasoning and Fail to Adequately Consider the Resulting Inconsistent Outcomes, the Retroactive Impacts, and the Significant Harms. ... 39

C) The Final Rule and Policy Alert Are Arbitrary and Capricious, as They Do Not Adequately Address That Supplemental Supports Help Maintain a Healthy and Stable Nation and Do Not Demonstrate Dependency. ... 49

1) Food Programs Like SNAP Provide Supplemental Support, Prevent Health Problems, Promote Healthy Eating Habits, and Are Not a Proxy for Dependency. ... 50

2) Use of Health Insurance Programs, Which Increases Access to Preventative Healthcare and Treatment, Does Not Demonstrate Dependency. ... 52

3) Use of Housing Assistance Programs, Which Decrease Displacement and Homelessness, Does Not Equate to Dependency. ... 53

4) Educational Supports for Children Do Not Equate to Dependency and Are Crucial to the Nation's Success. .......... 54

D) The Lack of a Fair and Transparent Process for the Final Rule and Policy Alert Demonstrates the Arbitrary and Capricious Nature of DHS's Actions. .......... 54

E) To the Extent the Policy Alert Imposes New Obligations, Defendants Failed to Observe Required Procedure. .......... 56

I. The Final Rule and Policy Alert Harm Plaintiffs. .......... 58

1. The Final Rule and Policy Alert Have and Will Continue to Have a Broad Chilling Effect on Public Benefits Enrollment. .......... 58

2. The Final Rule and Policy Alert Will Result in Negative Public Health Outcomes. .......... 62

A) The Final Rule and Policy Alert Will Harm Public Health. .......... 62

B) The Final Rule and Policy Alert Will Increase Food Insecurity. .......... 71

C) The Final Rule and Policy Alert Will Increase Housing Instability and Increase the Risk of Homelessness. .......... 75

D) The Final Rule's Chilling Effect Impedes Access to Education and Will Harm Many Children. .......... 77

3. The Final Rule and Policy Alert Will Harm Plaintiffs' Economic Interests. .......... 81

A) The Final Rule and Policy Alert Will Result in Financial Losses to Plaintiffs' Hospitals and Increase their Costs. .......... 81

B) The Final Rule and Policy Alert Will Shift Other Costs for Healthcare, Food, and Shelter to Plaintiffs. .......... 85

C) The Final Rule and Policy Alert Will Negatively Affect the Labor Force.......... 87

D) By Chilling SNAP Enrollment, The Final Rule and Policy Alert Will Decrease Economic Productivity.......... 88

4. The Final Rule and Policy Alert Imposes Programmatic and Administrative Burdens on Plaintiffs.......... 90

**FIRST CAUSE OF ACTION.......... 92**

(Administrative Procedure Act—Contrary to Law and Exceeds Statutory Authority).......... 92

**SECOND CAUSE OF ACTION.......... 94**

(Administrative Procedure Act—Arbitrary and Capricious).......... 94

**THIRD CAUSE OF ACTION.......... 96**

(Administrative Procedure Act— Failure to Comply with Notice-and-Comment Requirements).......... 96

**PRAYER FOR RELIEF.......... 97**

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs City of New York, City of Chicago, City and County of San Francisco, County of Santa Clara, City of Seattle, and Martin Luther King, Jr. County ("King County") (collectively, "Plaintiffs") file this Complaint against Defendants United States Department of Homeland Security ("DHS"), Secretary of Homeland Security Markwayne Mullin in his official capacity, United States Citizenship and Immigration Services ("USCIS"), and Director of USCIS Joseph B. Edlow in his official capacity (collectively, "Defendants") to vacate and enjoin the unlawful federal rule on the public charge ground of inadmissibility issued July 20, 2026 ("Final Rule") and equally unlawful policy guidance relating to the Final Rule issued on August 18, 2026, through a "Policy Alert," in the USCIS Policy Manual (the "Policy Alert"). In support of this Complaint, Plaintiffs allege as follows:

## INTRODUCTION

1. Through the Final Rule[1] and Policy Alert[2], Defendants seek to radically and unilaterally change the meaning of the statutory term "public charge" and upend the legal and regulatory regime surrounding public charge determinations. The Immigration and Nationality Act ("INA") established the public charge ground of inadmissibility, which provides that a noncitizen who is "likely at any time to become a public charge" is inadmissible. Although the INA does not expressly define the term "public charge," the statutory term's meaning has been consistent over more than a century of case law and administrative practice: the public charge ground of

[1] Public Charge Ground of Inadmissibility, 91 Fed. Reg. 45,324 (July 20, 2026), https://www.federalregister.gov/documents/2026/07/20/2026-14539/public-charge-ground-of-inadmissibility [archived at https://perma.cc/S3AY-VN83].

[2] U.S. Citizenship and Immigration Servs., PA-2026-09, Policy Alert on the Public Charge Ground of Inadmissibility (Aug. 18, 2026), https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20260818-PublicChargeFinalRule.pdf [archived at https://perma.cc/5ZAE-RJ2Z] (hereinafter, "Policy Alert") (attached as Exhibit A).

inadmissibility bars persons who are likely to become primarily dependent on government assistance for subsistence, meaning persons who rely on government cash assistance for income maintenance or require long-term institutionalization at government expense. DHS codified this long-established standard in a 2022 final rule ("2022 Rule"). The 2022 Rule and the history it codifies reflect an understanding that the use of supplemental public benefits can provide support on the journey to a better life and is not a reliable predictor of future dependence. DHS now seeks to sweep away over a century of settled law and regulation and replace it with an illegal "governance by ambiguity" regime that allows any use of means-tested public benefits to label a person a public charge.

2. The Final Rule rejects and rescinds all prior regulatory specificity about the definition of public charge, scrapping more than a hundred years of law and history and decades of federal guidance. In a drastic departure from the settled meaning of public charge, under which a public charge is someone whose survival is "primarily dependent" on government for subsistence—reflected through reliance on public cash benefits for income maintenance or long-term institutionalization at government expense—DHS[3] adopts an overly broad framework with no meaningful limitations. This is made all the more apparent in the so-called subregulatory guidance that the Final Rule promised. A month after promulgating the Final Rule, DHS promulgated a totally rewritten version of its Policy Manual section on the public charge ground of inadmissibility, the Policy Alert, which purports to implement the Final Rule. The Policy Alert directs that "an alien is likely *at any time* to become a public charge," if they are "likely at any time to depend on means-tested public benefits"—entirely excising the settled understanding that

[3] DHS and USCIS (a component of DHS) issued the Final Rule and Policy Alert. Accordingly, references to "DHS" in this Complaint in connection with the Final Rule and Policy Alert include USCIS.

public charge requires primary dependence and reliance on benefits for subsistence. The Final Rule and Policy Alert make plain Defendants' plan and expectation to hold many more individuals inadmissible on public charge grounds than under the statute or any prior application of it would allow. The Final Rule and Policy Alert are thus contrary to law, broadly sweeping in people Congress never considered or intended to be public charges under the INA.

3. The Final Rule and Policy Alert are also contrary to law because they ascribe a meaning to "public charge" inconsistent with the well-settled definition of the term. The Final Rule and Policy Alert unlawfully direct consideration of *any and all* means-tested public benefits without clear and transparent guardrails on how such consideration is consistent with the settled understanding of public charge. The Final Rule and Policy Alert adopt an interpretation of public charge that strays from reliance on public benefits for subsistence, which is evident from the fact that Defendants target programs that have never been part of the public charge analysis and are well-recognized as only providing temporary and supplemental supports on the path to self-sufficiency, such as the Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC"). Under the Final Rule and Policy Alert, an officer could hold a person inadmissible on even *de minimis* anticipated use of such programs. This is contrary to history, case precedent, and congressional intent.

4. The Final Rule and Policy Alert are not, as Defendants incorrectly claim, consistent with Congress's intent in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), which limits noncitizens' eligibility to receive some means-tested public benefits. Defendants misinterpret congressional intent in PRWORA and unlawfully conflate this erroneous understanding with the INA's public charge provision. This is legal error, not in accordance with law, and will chill immigrants from using public benefits to which they are

entitled—resulting in grave public health, safety, and economic consequences for Plaintiffs and the country.

5. The Final Rule stated that "nonbinding" subregulatory guidance would be forthcoming to further explain the rule and how Defendants would implement it. Defendants then issued the Policy Alert on August 18, 2026. Contrary to what is stated in the Final Rule, the Policy Alert is binding on immigration officers; indeed, DHS itself asserts that its entire Policy Manual is binding. *See, e.g.*, Policy Alert at 1 ("The guidance contained in the Policy Manual is controlling"). Neither the Policy Alert nor the Final Rule, of which the Policy Alert is a part, imposes any material limit on how immigration officers define public charge.

6. The Final Rule and Policy Alert are arbitrary and capricious. They eschew a clear, decades-old standard and are based on a misinterpretation and misuse of PRWORA. Defendants fail to reasonably explain their drastic change in position, speculating without any supporting evidence that the 2022 Final Rule had unduly constrained immigration officers and thus prevented them from identifying and holding inadmissible anyone who was, in fact, likely to become a public charge. The Final Rule and Policy Alert are also arbitrary and capricious because they will broadly sweep in people Congress never considered to be public charges under the INA. The Final Rule purports to be prospective but Defendants fail to consider its retroactive impacts. DHS dismisses the severe public health and economic harms the Final Rule will cause through engendering widespread fear and confusion—leading to reduced use of health and education services with community-wide benefits—in immigrant communities within Plaintiffs' jurisdictions. The Final Rule irrationally demands that officers—without training, information, or guidance—serve as de facto economists to research and apply "empirical data" as well as "relevant statistics" regarding "long-term outcomes for [benefits] program participants and impacts on health, employment, and

employability" in reaching their determinations. The Policy Alert provides no such guidance. The Final Rule and Policy Alert also provide no meaningful limits or explainable standards. Instead, the Policy Alert (incorrectly) states that public charge is "typically demonstrated through the use of means-tested public benefits," yet both the Final Rule and the Policy Alert fail to commit to a meaningful definition of means-tested public benefits, leaving it confusingly open-ended. The Final Rule and Policy Alert are untethered to the reality on the ground and invite arbitrary, inconsistent, and discriminatory decision-making.

7. John Adams described a republic as "an Empire of Laws, and not of Men." Our nation's founding is grounded in this core value. With the new public charge "rule," Defendants eviscerate this principle. The Final Rule deletes a historically grounded definition and instead, along with the Policy Alert, leaves ambiguity without limits. The Final Rule and Policy Alert chip away at the integrity of our system, such that the rule of law, equality, and fairness give way to the vagaries of individuals with power. This is a system where the Empire is not of Laws, but of Men.

8. The Final Rule and Policy Alert have caused and will cause affected populations to forgo nurturing supplemental benefits out of fear that being enrolled—or, indeed, even *applying*—for such programs will adversely affect their and their loved ones' immigration statuses. Yet these are precisely the programs that Congress has said expressly are supplemental—designed to promote stability and upward mobility, but impossible to subsist on—and for which Congress has preserved noncitizen eligibility. And by directing consideration of means-tested public benefits used by a noncitizen's family members, such as U.S. citizen children in mixed-status

households[4]—who the noncitizen is legally obligated to support[5] —the Final Rule and companion Policy Alert will cause U.S. citizen family members to withdraw from or forgo benefit programs as well. Defendants themselves agree it is likely—indeed, inevitable—that huge swaths of the population will forgo these benefit programs. Plaintiffs will directly face the economic, public health, and other harms that result. The increase in undiagnosed and untreated medical issues, homelessness, food insecurity, and educational challenges resulting from the broad chilling effect on public benefits will harm Plaintiffs. Plaintiffs and other local governments will necessarily incur the financial, administrative, and other costs of responding to and mitigating these harms because Plaintiffs are responsible for protecting the health and welfare of their residents and responding to the threats posed by diminished public health.

9. The wounds from the devastating global COVID-19 pandemic are still fresh. Over a million lives were lost in the United States, and Plaintiffs suffered a combined loss of over 50,000 lives. The Final Rule and Policy Alert will severely hinder Plaintiffs' current and ongoing efforts to combat viruses and diseases, with potentially devastating public health consequences. By deterring immigrants and their families, including U.S. citizen family members, from accessing healthcare and other benefits they are eligible to receive, such as testing and treatment of diseases, the Final Rule and Policy Alert will result in increased communicable disease transmission, severe illness, long-term health consequences, and deaths, including among children. The Final Rule and Policy Alert also compromise our nation's preparedness against disease outbreaks.

---

[4] Mixed-status households, as used in this Complaint, are households in which members have at least two different citizen statuses (*e.g.*, where at least one family member is a U.S. Citizen and at least one family member is a noncitizen).

[5] *See, e.g.*, Policy Alert at 33 (The receipt of means-tested public benefits by members of the applicant's household is "relevant to the public charge inadmissibility determination if: [1] The means-tested public benefits received by the alien's household member are the alien's source of financial support; or [2] The alien is legally obligated to support the household member who is receiving the means-tested public benefits.").

10. Defendants' radical departure from longstanding precedent, practice and policy violates the Administrative Procedure Act ("APA"). First, the Final Rule and Policy Alert are contrary to law and exceed Defendants' statutory authority, imposing a dramatic change to the well-established understanding of "public charge" in a manner that conflicts with the term's plain meaning, congressional intent, statutory context, longstanding administrative interpretation, and case law. Second, the Final Rule and Policy Alert are arbitrary and capricious. Defendants fail to reasonably justify their deviation from decades of settled practice, instead offering explanations that run counter to the evidence before them. The Final Rule is replete with failures to adequately consider the evidence before the agency. Defendants also fail to adequately consider important aspects of the problem, including the extensive and varied harms the Final Rule and Policy Alert will cause to Plaintiffs and their residents, and the serious reliance interests that past practice and policy engendered. The Final Rule and Policy Alert, which the Final Rule incorporates and which articulate Defendants' understanding and interpretation of the Final Rule, are also arbitrary and capricious in that they provide no meaningful limits or objective standards, and will lead to arbitrary, inconsistent, and discriminatory decision making.

11. In the alternative, the Policy Alert is also a separate final agency action that itself violates the APA because it is contrary to law, arbitrary and capricious, and the product of a deficient process that required but lacked notice and comment rulemaking procedures. An agency cannot evade notice and comment merely by labeling a substantive rule a "policy alert" or "guidance." Through the Policy Alert—a 99-page update to the USCIS Policy Manual—that carries out the Final Rule, DHS makes significant changes to the public charge regime. To the extent the Policy Alert imposes new obligations separate from the Final Rule, these provisions have real practical and legal consequences for the regulated public and adjudicators. To the extent

the Policy Alert functions as a legislative rule, DHS was required to comply with the notice and comment procedures prescribed by 5 U.S.C. § 553 of the APA. Having failed to do so, DHS promulgated the Policy Alert "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

12. Plaintiffs the City of New York, City of Chicago, City and County of San Francisco, County of Santa Clara, City of Seattle, and King County bring this action to vacate and set aside the Final Rule and Policy Alert and enjoin their implementation under the APA because they are not in accordance with law, 5 U.S.C. § 706(2)(A); exceed Defendants' statutory jurisdiction, authority, and limitations, *id.* § 706(2)(C); and are arbitrary, capricious, and an abuse of discretion, *id.* § 706(2)(A), and because when promulgating the Policy Alert, Defendants failed to observe procedure required by law, *id.* § 706(2)(D).

**JURISDICTION AND VENUE**

13. This action is brought pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701–706. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702.

14. This Court has the authority to grant the requested declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. § 706.

15. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §§ 1391(b) and (e)(1) because Defendants are United States agencies or officers sued in their official capacities, Plaintiff the City of New York is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this action occurred and are continuing to occur in this district.

## PARTIES

16. Plaintiff the City of New York is a municipal corporation organized pursuant to the laws of the State of New York. New York City is a political subdivision of the State and derives its powers through, *inter alia*, the New York State Constitution, New York State laws, and the New York City Charter. New York City is the largest city in the United States by population, and more than 3.1 million of its residents are foreign born—approximately 38 percent of New York City's population. One out of six children—more than 250,000—in New York City live in a mixed-status household, and one in two children in New York City has at least one immigrant parent.

17. Plaintiff the City of Chicago is a municipal corporation and home-rule unit organized and existing under the constitution and laws of the State of Illinois. Chicago is the largest city in Illinois and the third largest city in the United States by population. Over half a million—or about 21 percent—of Chicago's population is foreign-born.

18. Plaintiff the City and County of San Francisco ("San Francisco") is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city and county. San Francisco is the fourth largest city in California, and approximately a third of San Francisco's population is foreign born.

19. Plaintiff the County of Santa Clara ("Santa Clara") is a charter county and political subdivision of the State of California. Santa Clara County's nearly 2 million residents make it the most populous county in Northern California. Santa Clara's foreign-born population exceeds 750,000 people, approximately 40 percent of its population. More than 60 percent of children in Santa Clara County have at least one foreign-born parent. That is the highest percentage in California and one of the highest percentages of any county in the United States.

20. Plaintiff the City of Seattle ("Seattle") is a municipal corporation organized pursuant to the constitution and laws of the State of Washington. Seattle is the largest city by population in the State of Washington, and in King County, with over 737,000 residents. Approximately 143,000 Seattle residents—or 19 percent—are foreign-born. Immigrants are essential to Seattle's economy and to the region's growth, with 91.7 percent of recent population growth attributable to immigrants—the highest percentage in the country.

21. Plaintiff Martin Luther King, Jr. County ("King County") is a home rule charter county organized and existing under and by virtue of the constitution and laws of the State of Washington. King County has more than 2.3 million residents and is Washington State's most populous county. The County's foreign-born population exceeds 600,000 people, approximately 26 percent of its population. In the Seattle-Tacoma-Bellevue Metropolitan Statistical Area, in which the County is the largest jurisdiction, there are 340,200 U.S.-born children with at least one foreign born parent. In King County, there are 243,000 individuals living in mixed-status families, of which 104,000 of them are U.S. citizens. Between 2010 and 2024, the County's immigrant population grew by an extraordinary 58 percent. This is more than twice the rate of the County's overall population growth.

22. Immigrant communities are a critical driver of Plaintiffs' economic and population growth. Plaintiffs pride themselves on their ethnic and cultural diversity.

23. Plaintiffs are primary safety-net providers for their residents. Plaintiffs operate and fund a variety of programs and services, including emergency shelter and housing assistance, food and nutrition assistance, general assistance, and vital healthcare services.

24. Plaintiffs administer numerous benefit programs and public social services within their jurisdictions.

25. Plaintiffs are aggrieved by Defendants' actions because the Final Rule and Policy Alert will harm the public health of Plaintiffs' communities, Plaintiffs' public health efforts, and impose significant financial costs and economic harms to Plaintiffs. Plaintiffs therefore have standing to bring this action and will continue to suffer injury unless and until the Final Rule and the Policy Alert are vacated and set aside.

26. Defendant United States Department of Homeland Security ("DHS") is a cabinet agency of the United States government and is an agency within the meaning of 5 U.S.C. § 552(f).

27. Defendant Markwayne Mullin is the Secretary of Homeland Security and is sued in his official capacity.

28. Defendant United States Citizenship and Immigration Services ("USCIS") is a component agency of DHS and an agency within the meaning of 5 U.S.C. § 552(f).

29. Defendant Joseph B. Edlow is the Director of USCIS and is sued in his official capacity.

## LEGAL AND FACTUAL BACKGROUND

### A. Federal Immigration Statutes Incorporated the Common Law Understanding of "Public Charge" as Primary Dependency.

30. For generations, the United States of America has welcomed immigrants seeking opportunity, offering a pathway for economic advancement and upward mobility. *See, e.g.*, John F. Kennedy, *Nation of Immigrants* (1958); *see also* Emma Lazarus, *The New Colossus* (1883) (welcoming "your tired, your poor, your huddled masses"). The nation's federal immigration law has reflected this history, excluding immigrants as a "public charge" only under narrow circumstances.

31. For over 140 years, the term "public charge" has been understood to mean a person who is primarily dependent on the federal government for cash-based, governmental assistance,

*i.e.*, for subsistence. The term has never been understood to include individuals who receive temporary, supplemental, or non-cash benefits (excluding long-term institutionalization at government expense). Since the 19th century, federal immigration statutes have incorporated this established and narrow common law meaning of "public charge." And over subsequent decades, Congress has repeatedly rejected numerous attempts to expand public charge beyond this meaning.

32. Congress first adopted the concept of "public charge," which had been used in several local and state statutes, with its enactment of the Immigration Act of 1882.[6] Like those early state and local statutes, the federal statute excluded those who could not work on a sustained basis, including, using the terminology of that time, "convicts, lunatics, idiots, and any person unable to take care of himself without becoming a public charge." Immigration Act of 1882, Pub. L. No. 47–376, 22 Stat. 214, 214 (1882).[7] And like the early state and local statutes on which it was based, the federal statute did not include as public charges individuals who may have needed temporary public assistance but were able to work. Indeed, while seeking to bar anyone likely to become a public charge, *id.* § 2, the Act simultaneously established an "immigration fund," which was to be used, *inter alia*, "for the care of immigrants arriving in the United States [and] for the relief of such as are in distress," *id.* § 1. Through those provisions, the federal statute differentiated between those arriving immigrants who were "unable to take care of [themselves]," from those who were merely "in distress." The former were to be excluded; the latter, admitted and provided with financial support. *Id.* §§ 1–2.

---

[6] *See* Gerald L. Neuman, *The Lost Century of American Immigration Law (1776-1875)*, 93 Colum. L. Rev. 1833, 1849 (1993) (citing Act of Feb. 26, 1794, ch. 32, § 15, 1794 Mass. Acts & Laws 375, 385.).

[7] Legislative debate on the 1882 Act shows that at least one member of Congress sought to prevent foreign nations from "'send[ing] to this country blind, crippled, lunatic, and other infirm paupers, who ultimately become life-long dependents on our public charities.'" 13 Cong. Rec. 5108-10 (June 19, 1882) (statement of Rep. Van Voorhis).

33. In 1907, Congress again made modest revisions to the grounds for exclusion, which it further amended in 1910.[8] Immigration Act of 1907, ch. 1134, § 2, 34 Stat. 898, 898–899 (1907); Act of Mar. 26, ch. 128, § 1, 36 Stat. 263, 263 (1910). Both the 1907 law and the amendment retained the grounds of exclusion for paupers, persons likely to become a public charge, professional beggars, persons with contagious illnesses, and individuals with permanent "defects"—individuals unable to support themselves and who would require ongoing government support. In view of the categories Congress included, these federal statutes thus reflected the preexisting meaning of public charge as limited to those who rely primarily on the government for subsistence.

### 1. Common Law Defines Public Charge as an Individual Primarily Dependent on the Government For Subsistence.

34. Courts and the Board of Immigration Appeals ("BIA")[9] have consistently interpreted "public charge" to mean individuals who primarily depend upon the government for subsistence. In 1915, the Supreme Court affirmed this understanding. In *Gegiow v. Uhl*,[10] the Court held that the public charge ground of exclusion did not cover the poor or the temporarily unemployed, but was intended to reach individuals permanently unable to support themselves.[11] The Court explained that temporary factors such as local labor conditions were irrelevant to a public charge finding and that such a determination must be based on "permanent personal

[8] Congress amended the immigration laws in 1891 and 1903, making slight revisions to the public charge ground of exclusion that affirm the interpretation of the 1882 Act that the term "public charge" was not used at the time to include short-term or temporary relief from the government. *See* Immigration Act of 1891, Pub. L. No. 51–551, §§ 1, 11, 26 Stat. 1084, 1084, 1086 (1891); An Act to Regulate the Immigration of Aliens Into the United States, Pub. L. No. 57–162, ch. 1012, § 2, 32 Stat. 1213, 1214 (1903).

[9] The BIA is an administrative appellate body within the Department of Justice that hears appeals from certain decisions rendered by immigration judges and by district directors of DHS.

[10] 239 U.S. 3 (1915).

[11] *Id*. at 9–10.

objections."[12] A "likely public charge" determination under the common law thus required a permanent and unalterable condition of dependence, rather than a condition of temporary hardship or low-income status.

35. In the decades following *Uhl*, courts rejected a broad "latitudinarian construction" of public charge and held that the term encompassed only "those persons who are likely to become occupants of almshouses for want of means with which to support themselves in the future."[13] From the 1940s to the present, the BIA and circuit courts have continued to adhere to this narrow definition, overturning public charge exclusions of employable immigrants found inadmissible for having low incomes or using some public benefits.[14] Interpreting decades of common law on public charge, the BIA found that the INA "requires more than a showing of a possibility that the alien will require public support."[15]

36. For applicants who arrived in the United States without financial resources but were willing and able to work in the long term, the public charge exclusion did not apply; public charge determinations were thus the exception, not the rule.

### 2. The Immigration and Nationality Act of 1952 Incorporated the Common Law Definition of Public Charge.

37. As originally enacted in 1952, and still today, the INA provides that "[a]ny alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of

[12] These permanent personal objections included: long-term poverty ("paupers and professional beggars"), disability ("idiots" and those with "a mental or physical defect"), a history of criminality ("convicted felons, prostitutes"), or "persons dangerously diseased." *Id.* at 10.

[13] *See, e.g. Ex parte Mitchell*, 256 F. 229, 232 (N.D.N.Y. 1919) (citations omitted); *see also Howe v. United States*, 247 F. 292, 294 (2d Cir. 1917); *U.S. ex rel. Mantler v. Comm'r of Immigration*, 3 F.2d 234, 235 (2d Cir. 1924).

[14] *See, e.g.*, *infra* at ¶ 40 (referencing administrative case law holding that a noncitizen "has been on welfare does not, by itself, establish that he or she is likely to become a public charge").

[15] *Matter of Martinez-Lopez*, 10 I. & N. Dec. 409, 421 (BIA 1962); *see also, e.g.*, *Matter of A-*, 19 I. & N. Dec. 867, 869 (Comm. 1988).

the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge, is inadmissible." 8 U.S.C. § 1182(a)(4).

38. The INA requires that most applicants seeking to adjust their status to become permanent residents be subject to public charge determinations. Defendant USCIS is a component of DHS and has authority to make public charge determinations for adjustment of status applications. 8 U.S.C. § 1201(a). Prior to March 1, 2003, this function was performed by the Immigration and Naturalization Service ("INS"), under the purview of the United States Department of Justice ("DOJ"). After 2003, this authority was assigned to DHS.[16]

39. Congress incorporated the common law definition of public charge into the INA. Congress enacted the INA's public charge provision against the backdrop of decades of clear and consistent court and agency decisions defining a public charge as an individual primarily dependent on governmental assistance. Congress gave no indication that it intended to change that prevailing common law interpretation.

40. The United States Attorney General issued a decision in 1964, noting that the term "public charge" had been the subject of "extensive judicial interpretation" and that the "general tenor" of the case law understood the term to require "[s]ome specific circumstance, such as mental or physical disability, advanced age, or other fact reasonably tending to show that the burden of supporting the alien is likely to be cast on the public[.]" *Matter of Martinez Lopez*, 10 I. & N. Dec. 409, 421 (A.G. 1964); *see also Matter of Vindman*, 16 I. & N. Dec. 131, 132 (R.C. 1977). And in *Matter of Perez*, the BIA explicitly held that "[t]he fact that an alien has been on welfare does not,

[16] The statute also requires that applicants for U.S. visas —such as people applying for family- or employment-based visas—be subject to public charge determinations, but those determinations are made by the Department of State, not DHS. *See* State Dep't Foreign Affairs Manual, 9 FAM 302.8–2.

by itself, establish that he or she is likely to become a public charge." 15 I. & N. Dec. 136, 137 (B.I.A. 1974).

### 3. Congress Repeatedly Rejected Efforts to Expand Public Charge Beyond the Common Law Definition.

41. Since the passage of the INA, Congress has consistently resisted expansion of the public charge definition to reach immigrant applicants who receive supplemental non-cash benefits, even as it has created and then adjusted such benefit programs over the subsequent years.

42. With welfare and immigration reform in the 1990s, Congress again considered the public charge ground of inadmissibility, and it ultimately rejected every proposal to change the meaning of the term "public charge." While the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") and PRWORA imposed restrictions on immigration, the bills also set baseline protections for immigrants' use of public benefits that DHS now seeks to replace.

43. In early 1996, Congress considered the Immigration Control and Financial Responsibility Act ("ICFRA"), which would have expressly altered the well-established meaning of "public charge" to encompass a noncitizen who used almost any public benefit program for more than one year,[17] with limited exceptions for certain emergency medical and childhood nutrition services.[18] After months of debates and amendments, the Senate rejected the bill.

[17] The ICFRA would have defined "public charge" to encompass "any alien who receives benefits . . . for an aggregate period of more than 12 months" from: (i) the aid to families with dependent children program, (ii) Medicaid, (iii) the food stamp program, (iv) the supplemental security income ("SSI") program, (v) any state general assistance program, or (vi) "any other program of assistance funded, in whole or in part, by the Federal Government or any State or local government entity, for which eligibility for benefits is based on need." H.R. 2202 104th Cong. § 202(a)(5) (1996).

[18] The Act would have excluded the following services from public charge determinations: (i) emergency medical services under title XIX of the Social Security Act; (ii) prenatal and postpartum services under title XIX of the Social Security Act; (iii) short-term emergency disaster relief; (iv) assistance or benefits under (I) the National School Lunch Act (42 U.S.C. 1751 et seq.), (II) the Child Nutrition Act of 1966 (42 U.S.C. 1771 et seq.), (III) section 4 of the Agriculture and Consumer Protection Act of 1973 (Pub. L. No. 93–86; 7 U.S.C. 612c note), (IV) the

Discussing the proposed change, Senator Leahy objected that "the definition of public charge goes too far in including a vast array of programs none of us think of as welfare. . . . The bill would affect the working poor who are striving against difficult odds to become self-sufficient. . . . The bill is unnecessarily uncertain and will yield harsh and idiosyncratic results that no one should intend." S. Rep. No. 104–249, at 64 (1996).

44. Later that year, Congress passed PRWORA, Pub. L. No. 104–193, 110 Stat. 2105 (1996). Although PRWORA provided limitations on eligibility for noncitizens for certain benefits, 8 U.S.C. §§ 1611(a), 1621(a), Congress did not modify the definition of public charge. PRWORA also ensured that noncitizens would remain eligible for numerous non-cash benefits, including emergency medical assistance, disaster relief, immunization services, and certain public housing benefits. 8 U.S.C. §§ 1611(b), 1621(b). And Congress acknowledged states' authority to offer state and locally funded public benefits to noncitizens pursuant to different eligibility requirements than PRWORA establishes for federal benefits. 8 U.S.C. § 1621(d). While promoting concepts of self- sufficiency and personal responsibility, PRWORA also recognized the need for a safety net. 8 U.S.C. §§ 1611(b), 1621(b), (d); 142 Cong. Rec. S9395 (Aug. 1, 1996) (Statements of Sen. Pressler).

45. A little over a month after enacting PRWORA, Congress passed IIRIRA, which modified certain aspects of the public charge analysis, but again did not modify the meaning of "public charge" as primarily dependent on the government for subsistence, or expand it to include receipt or reliance on supplemental benefits. Instead, IIRIRA amended the INA to list factors for

---

Emergency Food Assistance Act of 1983 (Pub. L. No. 98–8; 7 U.S.C. 612c note), (V) section 110 of the Hunger Prevention Act of 1988 (Pub. L. No. 100–435; 7 U.S.C. 612c note), and (VI) the food distribution program on Indian reservations established under section 4(b) of Public Law 88–525 (7 U.S.C. 2013(b)); or (v) any student assistance received or approved for receipt under title IV, V, IX, or X of the Higher Education Act of 1965 in an academic year which ends or begins in the calendar year in which the Act is enacted until the matriculation of their education. *Id.* §§ 201–02.

officers to consider when determining which applicants were likely to become a public charge, including the applicant's age, health, family status, financial status, and education and skills. Pub. L. No. 104–208, § 531(a), 110 Stat. 3009–546, 3009–674–75 (1996).

46. In 2002, Congress passed the Farm Security and Rural Investment Act that rolled back some of PRWORA's restrictions to restore access to supplemental nutrition benefits for many noncitizen children and noncitizens receiving disability benefits. Pub. L. No. 107–171, § 4401, 116 Stat. 134 (2002). That Act also provided that noncitizens who had been present in the country for more than five years would be eligible for supplemental nutrition benefits. *Id.* at 116 Stat. 334.

47. The 2009 Children's Health Insurance Program ("CHIP") Reauthorization Act further expanded access to benefits for noncitizens, allowing states to provide Medicaid[19] and CHIP coverage to lawfully residing noncitizen children and pregnant women during their first five years in the country. Pub. L. No. 111–3, § 214, 123 Stat. 8, 56 (2009).

48. In 2013, Congress rejected yet another attempt to broaden the definition of public charge in a proposed amendment to the Border Security, Economic Opportunity, and Immigration Modernization Act of 2013, S. 744, 113th Cong. (2013) ("Border Security Bill"). The amendment would have expanded the public charge ground of inadmissibility to bar applicants for admission if they were likely "to qualify even for non-cash employment supports" such as Medicaid and the Supplemental Nutrition and Assistance Program ("SNAP"). S. Rep. No. 113–40, at 42 (2013). The Judiciary Committee noted that senators who opposed the amendment "cited the strict benefit restrictions and requirements." *Id.*

[19] The Complaint refers to Medicaid for consistency and to avoid confusion. However, with respect to several states, including New York and California, allegations concerning "Medicaid" refer to all components—both federal and state components.

49. H.R. 1, which was signed into law in 2025, restricted federal benefit access for noncitizens yet retained eligibility for certain federal benefits, including Medicaid, Medicare, the Children's Health Insurance Program, SNAP, and Affordable Care Act Market place subsidies, for various categories of noncitizens. Congress thus expressly preserved access to these federal benefit programs under the circumstances specified by statute. Yet, despite directly adjusting noncitizen benefit eligibility in H.R.1, Congress still chose not to amend the public charge ground of inadmissibility to make the receipt of those preserved benefits a basis for a public charge determination. Had Congress intended to impose such a consequence, it would have done so explicitly.

**B. <u>The 1999 Guidance on Public Charge Codified the Primary Dependence Standard.</u>**

50. In 1999, INS published guidance on the definition of public charge, which reflected the well-established common law meaning of "public charge" recognized by courts, agencies, and Congress: an individual primarily dependent on cash-based governmental assistance over the long term. U.S. Dep't of Justice, Immigration and Naturalization Serv., *Field Policy Alert on Deportability and Inadmissibility on Public Charge Grounds*, 64 Fed. Reg. 28,689–93 (Mar. 26, 1999) ("1999 Guidance").

51. Articulating this longstanding meaning, the 1999 Guidance said a public charge is a noncitizen "who is likely to become (for admission/adjustment purposes) primarily dependent on the government for subsistence, as demonstrated by either (i) the receipt of public cash assistance for income maintenance or (ii) institutionalization for long-term care at government expense." 64 Fed. Reg. at 28,689. Immigrant applicants who received non-cash benefits or who received less than 50 percent of their income from the government were not considered to fall within the definition of public charge. *Id.*

52. Before issuing the 1999 Guidance, the INS consulted with agencies that administer public benefit programs and thus have expertise in the nature and use of public benefits, including the Social Security Administration ("SSA"), the Department of Health and Human Services ("HHS"), and the Department of Agriculture ("USDA"). Those agencies opined that cash benefits—rather than non-cash benefits like SNAP, Medicaid, or housing assistance—and long-term institutionalization, were the best indicators of whether an individual is relying primarily on the government. After that consultation, the INS determined in the 1999 Guidance that only cash benefits, and not non-cash supplemental benefits, should be considered when assessing the likelihood that an individual would become a public charge. *See id.*

53. The 1999 Guidance applied in both the admission and removal contexts. 64 Fed. Reg. at 28,689.

54. The INS explained that guidance was necessary to clarify, in the wake of PRWORA, "the relationship between the receipt of public benefits and the concept of 'public charge'" because PRWORA "deterred eligible aliens and their families, including U.S. citizen children, from seeking important health and nutrition benefits that they are legally entitled to receive." *Id.* at 28,692.

55. The 1999 Guidance acknowledged the well-documented benefits of access to public benefits and recognized that receipt of non-cash benefits did not correlate with a likelihood of long-term dependence on the government for subsistence. The INS noted that "[t]his reluctance to access benefits has an adverse impact not just on the potential recipients, but on public health and the general welfare." *Id.*

56. The 1999 Guidance also concluded that the "nature of the public program" is critical to determining whether a particular public benefit is relevant to the public charge

determination. 64 Fed. Reg. at 28,678–79. As the INS explained, non-cash benefits (other than institutionalization for long-term care) are by their nature supplemental and do not, alone or in combination, provide sufficient resources to support an individual or family. *Id.* at 28,678. Such non-cash benefits are also often "available to families with incomes far above the poverty level," the INS explained, reflecting broad public policy decisions about improving general public health and nutrition rather than any indication that a recipient is primarily dependent on the government. *Id.* By contrast, substantial cash benefits for income maintenance may provide enough resources to primarily support an individual or family.

57. In addition to expressly codifying which circumstances and public benefits gave rise to a public charge determination, the 1999 Guidance explained in greater detail the application of the INA's public charge considerations, including "age, health, family status, assets, resources, and financial status, and education and skills." 64 Fed. Reg. at 28,679–82, 87; 8 U.S.C. § 1182(a)(4)(B)(i). Consistent with BIA decisions in the 1960s and 70s,[20] the 1999 Guidance required INS officials to evaluate each factor as a part of a totality of circumstances test to assess whether an applicant would become primarily dependent on governmental assistance in the future. 64 Fed. Reg. at 28,690. The 1999 Guidance provided that "[s]ervice officers should assess the financial responsibility of the alien by examining the totality of the alien's circumstances at the time of his or her application . . . . The existence or absence of a particular factor should never be the sole criterion for determining if an alien is likely to become a public charge." *Id* (emphasis omitted).

[20] *See Matter of Martinez-Lopez*, 10 I. & N. Dec. 409, 421–22 (AG 1964) (finding that a determination of public charge "requires more than a showing of a possibility that the alien will require public support" and "[s]ome specific circumstance . . . tending to show that the burden of supporting the alien is likely to be cast on the public, must be present"); *see also Matter of Harutunian*, 14 I. & N. Dec. 583 (BIA 1974) (determining applicant was a public charge after considering the totality of the applicant's circumstances, including age, inability to earn a living, and lack of family or other support).

58. The 1999 Guidance further specified that the public charge determination for visa and green card applicants was forward-looking and that "past receipt of non-cash benefits" and even "past receipt of special-purpose cash benefits" should not be taken into account. 64 Fed. Reg. at 28,690.

59. Additionally, the 1999 Guidance stated that, as a general rule, public benefits received by a noncitizen applicant's children or other family members are not attributed to the applicant for public charge purposes. However, if the family is reliant on those benefits as their sole means of support, the applicant may be treated as having received cash assistance. 64 Fed. Reg. at 28,692. And because the 1999 Guidance excluded non-cash benefits from the public charge analysis, a family member's receipt of such benefits had no bearing on the determination of whether an applicant was likely to become a public charge. The 1999 Guidance noted courts' approval when the agency took precisely this approach to consideration of family members' benefits in the context of the amnesty legalization program of a 1986 immigration law. *Id.* at 28,691–92 (citing *Perales v. Reno*, 48 F.3d 1305, 1309–10 (2d Cir. 1995)).

60. There is no evidence in the record before Defendant agencies that, when applying the 1999 Guidance, DHS granted admission or green cards to applicants who were, in fact, likely to become primarily dependent on the government for subsistence.

61. Based on the 1999 Guidance, DOJ, the agency responsible for applying the public charge determination in the removal context at the time, issued a fact sheet acknowledging that the public charge doctrine "ha[d] been part of U.S. immigration law for more than 100 years" and clarifying that benefits like food supplements, public health benefits, and housing assistance were "not intended for income maintenance" and "are not subject to public charge consideration." U.S. Dep't of Justice, Public Charge Fact Sheet, 2009 WL 3453730 (Oct. 29, 2011).

## C. <u>The 2019 Public Charge Rule and Judicial Rejection of that Rule as Contrary to Law and Arbitrary and Capricious.</u>

62. In 2019, DHS unsuccessfully sought to expand the scope of the public charge inquiry by promulgating a final rule, entitled Inadmissibility on Public Charge Grounds ("2019 Public Charge Rule" or "2019 Rule"), that purported to define "public charge" to mean noncitizens who used a specified quantity of certain, enumerated benefits. These benefits included non-cash programs, even where such benefits were temporary or supplemental. The 2019 Rule imposed a prescriptive system that heavily negatively weighted certain characteristics, including unemployment, past receipt of (or approval to receive) public benefits (including supplemental benefits) for more than 12 of the previous 36 months, inability to cover medical costs, and prior public charge determinations.

63. The 2019 Public Charge Rule thus marked a sharp break from the 1999 Guidance and decades of agency practice, which had tied "public charge" to primary dependence on cash assistance or long-term institutionalization at government expense.

64. The 2019 Rule sought to expand the types of benefits whose anticipated use would render a person inadmissible on public charge grounds to include, among others, supplemental programs like SNAP, Medicaid for non-pregnant adults, and certain federal housing assistance programs. These programs had long been available to eligible immigrants and their families without any suggestion from Congress that their lawful use would render a person a "public charge."

65. At the time it promulgated the 2019 Rule, DHS was on notice, including from its own prior analyses and extensive public comments, that expanding the list of benefits considered in a public charge determination would deter eligible families from accessing critical food, health,

and housing programs, including for U.S. citizen children in mixed-status families, due to fear of immigration consequences.

66. Following publication of the 2019 Rule, numerous states and local governments—including several of the Plaintiffs in this action—and nonprofit organizations filed lawsuits in federal courts across the country challenging the rule under the INA, the APA, and, in some cases, the Constitution. Several district courts, including a court in this district, granted preliminary injunctions barring implementation of the 2019 Rule, finding that the plaintiffs were likely to succeed on the merits of their INA and APA claims and faced irreparable harm.[21]

67. The federal government appealed, and courts of appeals, including the Second, Seventh, and Ninth Circuits, issued detailed opinions addressing the legality of the 2019 Public Charge Rule, the meaning of "public charge" under the INA, and DHS's compliance with the APA. Those three circuits ultimately recognized substantial legal defects in the 2019 Rule's misinterpretation of the statute and the agency's adherence to the rulemaking process.[22]

68. In evaluating the 2019 Rule, the Second, Seventh, and Ninth Circuits emphasized that, under historical practice and the common law, a "public charge" meant a person primarily dependent on government support, not a person who made incidental or supplemental use of public benefits. These courts concluded that the 2019 Rule's redefinition of "public charge" to include short-term or partial use of an expanded list of benefits conflicted with the INA's text, structure,

[21] *See, e.g.*, *New York v. DHS*, 408 F. Supp. 3d 334, 351 (S.D.N.Y. 2019); *see also New York v. DHS*, 969 F.3d 42, 70–80, 83-84 (2d Cir. 2020); *Cook Cty. v. McAleenan*, 417 F. Supp. 3d 1008, 1027 (N.D. Ill. 2019); *Cook Cty. v. Wolf*, 962 F.3d 208, 223–29 (7th Cir. 2020); *City & Cty. of San Francisco v. USCIS*, 408 F. Supp. 3d 1057, 1102–05 (N.D. Cal. 2019); *City & Cty. of San Francisco v. USCIS*, 981 F.3d 742, 758 (9th Cir. 2020); *but see CASA de Md., Inc. v. Trump*, 971 F.3d 220 (4th Cir. 2020) (upholding 2019 Final Rule), *vacated and reh'g en banc granted*, 981 F.3d 311 (4th Cir. 2020), *appeal dismissed*, *Casa de Md., Inc. v. Biden*, No. 19–2222, 2021 U.S. App. LEXIS 7177 (4th Cir. Mar. 11, 2021). The Supreme Court stayed certain of the district court injunctions but expressed no views. *Dep't of Homeland Sec. v. New York*, 589 U.S. 1173, 1173 (2020).

[22] *See id.*

history, and purpose, and was likely arbitrary and capricious, "not in accordance with law," and an unreasonable construction of INA § 212(a)(4) (8 U.S.C. § 1182 (a)(4)).

69. Subsequently, a district court in the Seventh Circuit vacated the 2019 Rule. *Cook Cty. v. McAleenan*, 417 F. Supp. 3d 1008 (N.D. Ill. 2019). The Seventh Circuit granted a stay of that judgment pending appeal, DHS successfully moved to dismiss its appeal, and the rule was vacated. *Cook Cty. v. Wolf*, 962 F.3d 208 (7th Cir. 2020). DHS ultimately chose to stop defending the 2019 Rule in court and rescinded it.

### D. The 2022 Public Charge Rule Restores and Codifies the Longstanding "Primary Dependence" Standard.

70. In 2022, DHS promulgated a final rule entitled "Public Charge Ground of Inadmissibility" ("2022 Rule"). The 2022 Rule restored and codified the longstanding understanding of "public charge" as someone who is likely at any time to become primarily dependent on the government for subsistence, as demonstrated by either the receipt of cash assistance for income maintenance or long-term institutionalization at government expense. 8 C.F.R. § 212.21(a) (2022).

71. Consistent with the 1999 Guidance, the 2022 Rule expressly excluded from consideration a broad range of non-cash benefits and supplemental programs, such as Medicaid (other than for long-term institutionalization), CHIP, SNAP, WIC, school meals, and most housing and energy assistance. These programs, the 2022 Rule reasoned, are designed to supplement income and promote health and stability, not to provide complete support. Moreover, the 2022 Rule recognized that neither DHS nor INS had ever considered free school lunches, home energy assistance, childcare assistance, or special nutritional benefits for children and pregnant individuals to be the types of public benefits that should be considered in a public charge inadmissibility determination.

72. In adopting the 2022 Rule, DHS acknowledged and relied on the definition of "public charge" established by decades of administrative practice, the common law, and the historical understanding of the term.

73. In 2022, DHS also considered extensive evidence that the agency's attempt to broaden the public charge definition in the 2019 Rule, and the rulemaking process preceding it, had created widespread confusion and fear in immigrant communities, including mixed-status households. This documented "chilling effect" resulted in noncitizens and their family members disenrolling from or forgoing critical health, nutrition, and housing programs for which they were lawfully eligible and that benefited the broader health and welfare of their communities.

74. Among the 2022 Rule's stated goals were to (i) provide clear, administrable standards for adjudicators and the public that would lead to fair and consistent determinations and ensure equitable treatment of similarly situated individuals; and (ii) advance the federal government's interest in encouraging eligible noncitizens and their family members to access health care, nutrition, and housing assistance without fear of immigration consequences, thereby supporting public health and economic participation.

**E. <u>The 2025 Proposed Rulemaking.</u>**

75. On November 19, 2025, DHS published in the Federal Register a Notice of Proposed Rulemaking titled "Public Charge Ground of Inadmissibility," DHS Docket No. USCIS-2025-0304 ("2025 Public Charge NPRM" or "2025 NPRM"). Through the 2025 Public Charge NPRM, DHS proposed to rescind the 2022 regulatory definitions governing the public charge ground of inadmissibility under section 212(a)(4) of the INA, which matched the 1999 Guidance that incorporated the well-understood meaning of "public charge," without proposing any replacement regulatory standard. The NPRM clearly demonstrated a departure from the

historical and long-understood definition of "public charge." DHS also proposed amendments to its regulations governing the cancellation and breach of public charge bonds at 8 C.F.R. 103.6(c)(1). DHS provided a window of only thirty days, during a federal holiday, to submit comments on the proposed rule.

76. The 2025 Public Charge NPRM received over 5,000 comments, most of which opposed the rule. Many commenters strongly opposed the Proposed Rule and expressed concern for the substantial negative public health outcomes and economic consequences that would result from decreased enrollment in subsidized nutrition, health insurance, and housing programs. Commenters cautioned that these proposed changes, taken together, would target some of the country's most vulnerable residents, including persons with disabilities, women, and children.

## F. <u>The Final Rule.</u>

77. On July 20, 2026, DHS published the Final Rule in the Federal Register. 91 Fed. Reg. 45,324.

78. As the 2025 NPRM proposed, the Final Rule rescinds but does not replace the 2022 Rule's articulation of the statutory meaning or the 2022 Rule's regulatory text listing the categories of noncitizens subject to public charge, the factors and public benefits to be considered in public charge inadmissibility determinations, and the exemptions and waivers from public charge.

79. Under the cloak of the "totality of the circumstances" framework, the Final Rule directs immigration officers to consider, in addition to the mandatory statutory factors in the INA, a noncitizen's receipt of any means-tested public benefits—including, expressly, programs well-recognized to be supplemental supports—"any other individualized case-specific factors and circumstances" that the officer may decide is relevant, and "any empirical data" the officer may decide is relevant to self-sufficiency. The Final Rule states explicitly that DHS has abandoned the

well-established "primary dependence" standard for public charge determinations. 91 Fed. Reg. 45,324.

80. In the Final Rule, Defendants fail to provide a meaningful, codified definition of means-tested public benefits. DHS claimed that doing so was unnecessary as "that term is generally understood to refer to a government program or benefit where eligibility is based on an individual's or family's income and/or assets falling below a specific threshold." 91 Fed. Reg. at 45,343. DHS merely referenced a university's webpage stating that means-tested programs are "generally financed by tax revenues and may take the form of entitlements (e.g., Medicaid, SNAP/Food Stamps) or have spending caps (e.g., State Child Health Insurance Programs, housing subsidies, Temporary Assistance for Needy Families)." *Id.*

81. The Final Rule also amends the regulatory text on cancellation and breach of public charge bonds, removing language indicating that a breach occurs upon receiving cash assistance or long-term governmental institutionalization and replacing that text with language stating that any means-tested public benefits usage would constitute a breach of the public charge bond.

82. The Final Rule eliminates the 2022 Rule's codification of the definition of "public charge" based on a misinterpretation of PRWORA and incorrectly conflating that misinterpretation with the public charge statute. With this change, the Final Rule expands the meaning of public charge far beyond that of the rejected 2019 Rule—a rule that the Second Circuit and other courts rejected as contrary to law because of its overbreadth and departure from the "primary dependence" standard.

83. As discussed further below, the Final Rule is fatally flawed. Defendants reach conclusions in the Final Rule that are not rationally connected to the facts and fail to provide a reasoned explanation for their drastic change in position. The Final Rule is internally inconsistent

and is counter to the evidence before it. Defendants also do not adequately consider numerous significant issues, including a wide range of public health, economic, and administrative harms to Plaintiffs that will result from the Final Rule's adoption.

84. In response to a commenter requesting that DHS identify the legal authorities and other information, apart from those that predated the 1999 Guidance and the 2022 Final Rule, that DHS relied on in developing the Final Rule, DHS stated that the rescission of the 2022 Final Rule is "based on the same statutes, authorities, and other resources that served as the basis and justification for the 2022 Final Rule." 91 Fed. Reg. 45,335.

85. The Final Rule contemplates that DHS would issue "nonbinding" subregulatory guidance before the Final Rule becomes effective, which DHS did issue about 30 days later. The Final Rule also provides that USCIS will issue "policy and interpretive tools" and training but does not state whether all of those "tools" will be made public, implying by omission that they would not be made public or follow notice-and-comment procedures. Aside from the Policy Alert, DHS has not publicly announced or issued any additional policy and interpretive tools or training.

## G. <u>The Policy Alert.</u>

86. On August 18, 2026, Defendants published a 99-page subregulatory guidance titled "Policy Alert" that USCIS will include in its Policy Manual as an entirely revised version of Part G ("Public Charge Ground of Inadmissibility") of Volume 8 ("Admissibility") and that supersedes all prior guidance regarding the public charge ground of inadmissibility. Although the Final Rule had said the subregulatory guidance would be "nonbinding," the Policy Alert itself states that it is "controlling and supersedes any related prior guidance, including the 1999 Interim Field Policy Alert and any related guidance addressing public charge inadmissibility," Policy Alert at 1, and USCIS itself states its Policy Manual "contains the official policies of USCIS . . . and is to be

followed by all USCIS officers in the performance of their duties."[23] As described below, the Policy Alert speaks in mandatory terms and instructs officers to follow various directives. Policy Alert at 2–3 (the Policy Alert mandates what information "will be considered by officers" so they "faithfully and consistently make public charge inadmissibility determinations"). Taken together, and contrary to DHS's representations in the Final Rule, the Policy Alert is binding on immigration officers.

87. The Policy Alert expresses DHS's interpretation of "public charge" in light of the Final Rule's stated departure from the term's well-understood "primary dependence" standard—of public cash assistance for income maintenance or long-term institutionalization at government expense—found in the 2022 Rule. Specifically, the Policy Alert's "Key Concepts" state that "[f]or purposes of a public charge inadmissibility determination under INA § 212(a)(4), officers must determine whether an alien is *likely at any time* to become a public charge, *that is, likely at any time to depend on means-tested public benefits*." Policy Alert at 13 (emphasis added). Without providing a framework for doing so, the Policy Alert states that "officers will consider any evidence in the record pertaining to whether the alien has applied for any means-tested public benefits and/or whether the alien has been approved or certified to receive any means-tested public benefits." *Id.* at 50. Under the Policy Alert, officers will also consider disenrollment from the means-tested public benefit program. *Id.* at 51.

88. The Policy Alert refers repeatedly to "means-tested public benefits" (the phrase appears more than 100 times over the 99 pages), but it fails to provide a meaningful definition of that term. Instead, the Policy Alert provides that officers "should consider" various factors for

[23] *Policy Manual*, U.S. Citizenship and Immigration Services (Sep. 11, 2026), https://www.uscis.gov/policy-manual [archived at https://perma.cc/AN6S-TANW].

determining if a program is a means-tested public benefit and situations when a benefit "is generally considered" means-tested or a "public benefit," without explaining to officers when such circumstances would or would not be considered means-tested or a public benefit. Policy Alert at 14. The Policy Alert provides examples of public benefits "that could *potentially* be means-tested," without providing any limiting principle. *Id.* And the Policy Alert includes in the list of "potential" means-tested public benefits that have never been considered before as evidence that one might become a public charge, such as "financial aid for postsecondary education." *Id.*

89. Although the Policy Alert claims that it and the Final Rule only apply to applications postmarked on or after September 18, 2026, the Policy Alert's section titled "Receipt (of Means-Tested Public Benefits)" demonstrates their retroactive impact. There, Defendants direct officers to consider the noncitizen's application for, or certification or approval to receive, a benefit, separate and apart from a noncitizen's actual receipt of the benefit after September 18, 2026. Thus, immigration officers are instructed to consider such application, certification, or approval to receive a means-tested public benefit, even if such actions occurred prior to September 18, 2026, unless an applicant withdraws or expresses a desire to withdraw that application or certification. However, as discussed further below, *see infra* at ¶¶ 128–129, 312, in practice, applicants cannot effectively disenroll or withdraw from certain means-tested public benefits. As such, the Final Rule and Policy Alert, in its effect, retroactively penalizes applicants for benefits they applied for and received prior to the Final Rule. Moreover, in a drastic departure from longstanding practice, the Policy Alert in this section also makes clear that the receipt of means-tested public benefits for a noncitizen's child, relative, or household member can be weighed against the noncitizen applicant.

90. The Policy Alert contains a section entitled "Dependence on Means-Tested Public Benefits," which incorrectly states that "[i]n codifying [PRWORA's] immigration policy close in time to the enactment of the current iteration of INA 212(a)(4), USCIS believes that Congress intended these two statutes to address aliens' dependence on means-tested benefits to meet their needs." Policy Alert at 15. That section further states that "neither the statute nor relevant precedent decisions prescribe a primary dependence standard or consideration of only a narrow and specific list of public benefits for public charge inadmissibility determinations" and, as a result, "it is appropriate for officers to consider an alien's [potential] dependence on *any* means-tested public benefits to meet his or her basic needs." *Id.* (emphasis added). Thus, use of programs that Congress designed to supplement income and promote health and stability may now lead to determinations of public charge. And even more concerning, it is unclear what "potential dependence on any means-tested public benefits" even means. *Id.* The Policy Alert's hypothetical public charge "scenarios" do not fix the problem. Indeed, the scenarios establish that use of a single means-tested public benefit, such as Medicaid, may be enough to deem an individual a public charge.

91. The Policy Alert also sets forth the categories of individuals subject to and exempt from the public charge ground of inadmissibility as well as categories of individuals exempt from needing affidavits of support. As to applicants relying on an affidavit of support from a sponsor, the Policy Alert states that "a sufficient Form I-864 does not eliminate the need to consider all of the factors of a public charge inadmissibility determination, and USCIS only considers it as one factor in the totality of the circumstances." Policy Alert at 11. Moreover, USCIS may consider "whether the sponsor is actually willing to provide financial assistance" to the applicant. *Id.* at 12. This approach to sponsorship is a significant departure from prior practice, as affidavits of support will now carry less weight and will be subject to greater scrutiny. As to the public charge bond,

the Policy Alert confirms that "use of a single means-tested public benefit in any amount is sufficient for a breach." *Id.* at 92.

## H. The Final Rule and Policy Alert Violate the Administrative Procedure Act.

### 1. The Final Rule and Policy Alert Are Contrary to Law and in Excess of Statutory Authority.

#### A) The Final Rule and Policy Alert Conflict with the Meaning of the Statutory Term "Public Charge" and Are Not in Accordance with Law.

92. As discussed above, the term "public charge" has been a feature of U.S. immigration law since the nineteenth century and has consistently been understood to mean a person primarily dependent on government for subsistence. *See supra* at ¶¶ 30–36.

93. Defendants rescind the clear definitions and regulations codifying the historical and statutory meaning of public charge. Defendants expressly reject the coherent and well-established primary dependence standard and describe public charge as dependency with no clear limits. In fact, Defendants have impermissibly expanded the public charge definition to include any level of dependence on any means-tested public benefits. The Final Rule and Policy Alert set no meaningful outer bound on the type of information that might be relevant in predicting whether a person is likely to become a public charge or how that information should be assessed, aside from its undefined reference to the consideration of means-tested public benefits rather than any public benefits generally.

94. As discussed further below, the Final Rule and Policy Alert allow immigration officers to deny green cards or admission on public charge grounds based on even *de minimis* use of supplemental means-tested public benefits. This is an even weaker basis for rendering a person inadmissible on public charge grounds than was authorized by the 2019 Rule, which three circuit courts of appeals held to be contrary to law. Indeed, DHS concedes that it "believes that the current and/or past receipt of any means-tested public benefits is a key gauge in determining" a

noncitizens' likelihood of dependence on the government and therefore whether they are inadmissible as a public charge. 90 Fed. Reg. 52,186. Betraying its claims of a neutral "totality of the circumstances" analysis, DHS's proposed rule put a thumb on the scale by mandating that receipt of any means-tested public benefit is "almost always highly relevant" and a "key gauge" in the public charge analysis, *id.*, and this is precisely what the Final Rule did, *see also* Policy Alert at 27. The result is that DHS improperly treats public charge as an income test. These changes are contrary to history and Congress's intent embodied in the INA, not in accordance with law, and exceed DHS's rulemaking authority. *See New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 85 (2d Cir. 2020) ("DHS goes too far in assuming that all those who participate in non-cash benefits programs would be otherwise unable to meet their needs and that they can thus be categorically considered 'public charges'"); *see also City & Cty. of San Francisco v. USCIS*, 981 F.3d 742, 757 (9th Cir. 2020) ("There is a floor inherent in the words 'public charge,' backed up by the weight of history.") (quoting *Cook Cty. v. Wolf*, 962 F.3d 208, 229 (7th Cir. 2020)).

95. On at least three occasions—while debating ICFRA, IIRIRA, and the Border Security Bill—Congress considered and rejected proposals to alter the well-settled meaning of public charge to encompass receipt of non-cash supplemental benefits. 142 Cong. Rec. 24,313, 24,425 (1996); 142 Cong. Rec. S11,882 (daily ed. Sep. 30, 1996); S. Rep. No. 113-40, at 42, 63 (2013). The Final Rule and Policy Alert purport to instantiate *precisely* what Congress has thrice rejected.

96. For most of the relevant history of public charge, with exception to the 2019 Rule, the executive branch has also confirmed the meaning of public charge as primary dependence. *See supra* at ¶ 40 (discussing the United States Attorney General's 1964 decision and the 1999 Guidance).

97. As evident from this history, the Final Rule and Policy Alert are impermissibly broad and contrary to the historical and statutory meaning of public charge. They sweep in applicants who are not remotely likely to become primarily dependent on the government for subsistence. The Final Rule and Policy Alert place no meaningful guardrails, and DHS concedes that they are meant to be broader than all previous rules and regulations. Courts held the 2019 Rule unlawfully overbroad, and the Final Rule and Policy Alert go further—now defining public charge to include any person based on their use of *any* means-tested public benefit (a term left open-ended) for *any* amount of time.

98. Courts, not agencies, interpret statutes. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391, 412-13 (2024). The Second Circuit concluded that the statutory term "public charge" has a core, settled definition: it means primarily dependent on the government, *i.e.*, unable to support oneself and reliant on the government for subsistence. *New York*, 969 F.3d at 60, 65–73. The Ninth Circuit agreed. *City & Cty. of San Francisco*, 981 F.3d at 758. DHS has no authority to reject, circumvent or displace the statute's meaning, and its attempted departure is due no deference.

99. Defendants are acting in excess of the statutory authority of the INA.

100. Although Defendants claim that DHS's authority for issuing the Final Rule also comes from the Homeland Security Act of 2002 ("HSA"), nothing in the HSA grants the Secretary any authority to change or eliminate the definition of the statutory term "public charge."

101. The Final Rule and Policy Alert are inconsistent with other statutes. They all but mandate that officers consider an applicant's receipt of SNAP benefits when considering an applicant's income and assets, even though Congress has expressly said that SNAP benefits do not constitute income or resources under any federal, state, or local law. 7 U.S.C. § 2017(b). And the

Final Rule and Policy Alert are in significant tension with Congress's determination that several of the benefits that the Final Rule allows officers to consider as means-tested benefits in a public charge determination are excluded from the means-tested benefits for which the government can seek reimbursement from a noncitizen's sponsor. 8 U.S.C. § 1183a note (excluding 11 categories of public benefits, including free school lunch, Head Start, emergency Medicaid, and public health assistance for immunizations from the requirement of sponsor reimbursement). Indeed, the Policy Alert simply asserts, without explanation or rationale, that the term "means-tested public benefit" under the Final Rule and Policy Alert "is distinct from, and should not be confused with," the definition of that term for purposes of affidavits of support. Policy Alert at 14 n.57.

**B) The Final Rule and Policy Alert Incorrectly Conflate DHS's Misinterpretation of PRWORA with Public Charge.**

102. The Final Rule justifies its abandonment of the 2022 Rule with an erroneous interpretation of PRWORA, which it conflates with the distinct public charge inadmissibility statute, the INA. The Policy Alert likewise justifies its expansiveness by relying on the same misinterpretation and conflation of PRWORA.

103. Defendants misinterpret PRWORA in concluding that Congress intended with PROWRA to equate any dependence on means-tested public benefits with being a public charge. *See, e.g.*, Final Rule, 91 Fed. Reg. 45,337, 45,339; Policy Alert at 5, 13, 15. As the Second Circuit found, PRWORA reflects Congress's determination that noncitizen' use of means-tested benefits is consistent with assuring noncitizens self-sufficiency. *New York*, 969 F.3d at 81-82. The Seventh and Ninth Circuits agreed. *See Cook Cty.*, 962 F.3d at 228–29 (describing how Congress's exclusions of certain benefits to noncitizens in PRWORA were not "absolute"); *see also City & Cty. of San Francisco*, 981 F.3d at 751 ("[T]he fact that Congress delineated the factors relevant to the public charge determination at the same time it adjusted certain immigrants' eligibility to

receive specific supplemental assistance strongly suggests that Congress did not intend for such assistance to be considered as one of the public charge factors").

104. To achieve the goal of preventing overuse of benefits by noncitizens, PRWORA restricted eligibility for certain benefits, but made no changes to the INA's provisions regarding the public charge ground of inadmissibility. Moreover, nothing in PRWORA suggests that Congress intended its restrictions to impliedly alter the public charge ground of inadmissibility.

105. PRWORA and public charge are two distinct statutory regimes operating in different contexts. PRWORA's regulation of noncitizen eligibility for certain benefits does not equate to or evidence congressional intent to expand or redefine the public charge ground of inadmissibility. Defendants nonetheless conflate PRWORA with public charge. This error renders the Final Rule and Policy Alert contrary to law and arbitrary and capricious. *See SSM Litigation Group v. EPA*, 150 F.4th 593, 599–600 (D.C. Cir. 2025) (concluding that federal agency's rescission of an existing rule based on erroneous legal justifications was not in accordance with law); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–43 (1983) (holding that federal agency's rescission of a requirement was arbitrary and capricious because the agency failed to present an adequate basis and reasoned explanation).

106. In recognition of core principles of federalism, PRWORA also permits States to use broader eligibility criteria when providing state and local benefits to noncitizens who do not qualify for federal benefits. 8 U.S.C. § 1621(d). For DHS to now penalize noncitizens for using state and local benefits that Congress chose to permit is nonsensical and contrary to the scheme established by PRWORA.

### 2. The Final Rule and the Policy Alert Are Arbitrary and Capricious.

#### A) The Final Rule's Rescission of the 2022 Regulation Without Replacement Regulatory Text or Meaningful Limits Is Arbitrary and Capricious.

107. The Final Rule withdraws the 2022 regulation provisions that codified the long-established meaning of the statutory term "public charge" and fails to provide any replacement regulatory provisions. Instead, the Final Rule provides an overly broad framework without any clear limitations. This is not rectified or clarified by the Policy Alert, which similarly fails to provide any limitations. The Final Rule's rescission without replacement is arbitrary and capricious because Defendants fail to supply reasoned analysis for the change, articulate a rational connection between the facts found and the choice made, address prior factual findings underlying the rescinded regulations, and account for the serious reliance interests engendered by the prior regulation.

108. Defendants also fail to supply a sufficiently reasoned explanation for their change of position. Defendants wrongly proffers that the change reverts to pre-1999 Guidance without acknowledging or rebutting contrary evidence available to the agency. First, because the1999 Guidance reflected the long-established understanding of public charge to mean primary dependence on the government for subsistence, the Final Rule and Policy Alert are antithetical to the pre-1999 circumstances. Second, INS issued the 1999 Guidance "to counteract public confusion after IIRIRA and PRWORA," *New York*, 969 F.3d at 70, and to reduce the negative public health consequences flowing from that confusion. Defendants fail to grapple with those facts, which are nearly identical to the harms that the Final Rule and Policy Alert will produce. Defendants' justification for their change in position rests on speculation and erroneous legal interpretation and fails to consider evidence before it.

109. As discussed below, Defendants veer sharply away from past policies and practices, which engendered serious reliance interests, and fails to consider the significance and weight of

those interests and the consequences from the drastic changes in and uncertainty generated from the Final Rule.

110. The Final Rule and Policy Alert create an unjust system that invites bias in decision-making and will produce inconsistent and arbitrary outcomes. Defendants fail to adequately explain the rescission without replacement, leaving immigration officers without clear guidelines or constraints, which will inevitably lead to arbitrary enforcement. In the Policy Alert, Defendants also direct officers to negatively weigh factors previously accepted as promoting health and welfare, such as seeking health care or nutrition support while pregnant. Defendants also do not adequately explain why it did not make smaller adjustments or consider other alternatives rather than upend an entire system that noncitizens, mixed-status families, and Plaintiffs have relied upon for decades.

**B) The Final Rule and the Policy Alert Are Arbitrary and Capricious Because They Rely on Defective Reasoning and Fail to Adequately Consider the Resulting Inconsistent Outcomes, the Retroactive Impacts, and the Significant Harms.**

111. The Final Rule and Policy Alert are flawed, fail to consider important issues, are counter to the evidence before them, and fail to reasonably justify the creation of such enormous uncertainties for Plaintiffs and the entire nation.

112. The Final Rule and the Policy Alert are inconsistent and confusing in numerous respects. The Final Rule repeatedly and incorrectly claims that the Policy Alert is “nonbinding.” 91 Fed. Reg. 45,337, 45,338–39. However, the Policy Alert contradicts this claim by stating, for example, that it is “controlling” and “supersedes any related prior guidance.” Policy Alert at 1. The Final Rule and Policy Alert claim that the Policy Alert “help[s] guide, but not prescribe,” public charge inadmissibility determinations. 91 Fed. Reg. 45,385; Policy Alert at 9. However, the Policy Manual itself says it is binding, and the Policy Alert repeatedly directs immigration officers

to take various actions in mandatory terms. For example, the Policy Alert instructs officers to treat "likely at any time to depend on means-tested public benefits" as synonymous with "likely at any time to become a public charge." Policy Alert at 13.

113. The Final Rule and Policy Alert also contain no limiting principle as to which means-tested public benefits are covered both for public charge inadmissibility determinations and the bond provisions, resulting in a lack of adequate notice to the regulated public. *See infra* at ¶ 174.

114. Defendants fail to reasonably justify why the Final Rule and Policy Alert swap the clear, easily applied standards of the 2022 Rule with an overly broad framework that permits individual officers to reach different conclusions based on materially similar facts. DHS recognized that additional guidance was necessary to instruct officers on implementing the Final Rule, including how to consider an applicant's use of means-tested public benefits, yet the Policy Alert leaves central questions governing that consideration unanswered. For example, the Final Rule illogically demands that officers conduct research and apply "empirical data" as well as "relevant statistics" in reaching their determinations. But the Policy Alert provides no such guidance. It is unreasonable to expect immigration officers, already burdened by substantial backlogs, to do this empirical research without proper guidance and instructions.

115. Defendants also fail to reasonably justify their significant departure from prior practice. Defendants rely on a legally flawed interpretation of PRWORA and conflate it with the public charge statute. Defendants claim there are benefits to the changes but they cannot articulate them. Instead, Defendants use circular reasoning, stating that the Final Rule will result in a reduction in the number of "inadmissible" persons who enter the United States. Defendants do not provide any evidence in the record that when applying the 1999 Guidance or the 2022 Rule, DHS

struggled to identify or inappropriately granted admission or green cards to applicants who were, in fact, likely to become primarily dependent on the government for subsistence.

116. Defendants claim a "benefit" of the Final Rule would be a reduction in the number of noncitizens who rely on public benefits programs—despite the fact that Congress has made those benefit programs available to noncitizens—essentially stating that one of the goals of the Final Rule is disenrollment from public benefits programs. As discussed below, Defendants do not grapple with the immensely harmful downstream effects of reducing the use of benefits on health and economic outcomes. Defendants claim they wish to disincentivize immigration to the United States that is motivated by access to public benefits but fail to provide any evidence in the record that this is a problem. 91 Fed. Reg. at 45,342. Indeed, Defendants' premise is factually baseless. The weight of the empirical literature finds little or no evidence that the availability or generosity of public benefits serves as a meaningful incentive influencing immigrants' migration or location decisions.[24]

117. Moreover, Defendants fail to reasonably justify departing from prior practice to sweep into the public charge ground of inadmissibility various tax credits, such as Earned Income Tax Credits (EITC), Child Tax Credits, and American Opportunity Tax Credits, which have never been considered benefits relevant to public charge. DHS's consideration of these types of tax credits is arbitrary and capricious because it ignores that people making up to 400 percent of the federal poverty line would be included in the public charge analysis. Additionally, Defendants' consideration of these tax credits ignore the fundamental structural differences between tax credits

[24] *See, e.g.*, Madeline Zavodny, *Welfare and the locational choices of new immigrants*, Econ. & Fin. Policy Rev., Fed. Reserve Bank of Dallas, 2-10 (1997), https://ideas.repec.org/a/fip/fedder/y1997iqiip2-10.html; Neeraj Kaushal, *New Immigrants' Location Choices: Magnets without Welfare*, Journal of Labor Econs., Univ. of Chicago Press (2005), https://doi.org/10.1086/425433; Tsewang Rigzin, *Medicaid Expansion Through the Affordable Care Act and Interstate Mobility of Low-Income Immigrants: Welfare Magnet or Myth?*, Journal of Int'l Migration and Integration (2023), https://ideas.repec.org/a/spr/joimai/v25y2024i2d10.1007_s12134-023-01105-w.html.

and welfare benefits. *See Sorenson v. Sec. of Treasury*, 475 U.S. 851, 858 (1986) (classifying the EITC as a tax overpayment designed to reduce work disincentives, not to provide welfare assistance).

118. Defendants reach conclusions that are not rationally connected to the facts in the record. The Final Rule claims that its drastic change in position is needed because it will allow DHS to make more "reliable" determinations. 91 Fed. Reg. 45,324. Likewise, the Policy Alert claims it will help officers "faithfully and consistently make public charge inadmissibility determinations." Policy Alert at 3. But nothing in the record or in Defendants' explanations justify this unexplained optimism. To the contrary, Defendants entirely failed to consider the obvious possibility, if not likelihood, that rescission without replacement of the 2022 Rule's defined framework and bright line rules would decrease rather than increase consistency and reliability of the public charge determinations made by many different immigration officers. Additionally, while Defendants concede that the chilling effect from the Final Rule (which includes the accompanying Policy Alert) could have broad consequences for public benefit usage, Defendants inexplicably resist the practical result of that impact despite the record evidence to substantiate it. *See, e.g.*, 91 Fed. Reg. at 45,360-62. For example, Defendants simply disagree that the Final Rule will cause an increased risk of communicable disease among noncitizens, despite the fact that Defendants admit the Final Rule will chill individuals and families from seeking public health benefits. Perversely, Defendants reconcile these two positions by asserting that the Rule does not prevent individuals from accessing benefits for which they are eligible—even though, in practical effect, the Rule forces individuals to choose between accessing benefits and their ability to adjust status. Because they put their head in the sand, Defendants fail to adequately account for the increased public health risks in the noncitizen population and the significant ripple effects.

119. As detailed further below, the Final Rule's claimed "Regulatory Impact Analysis" fails to conduct a complete economic impact analysis, account for important issues, and quantify the many significant harms that Defendants admit will arise from the Final Rule.

120. Defendants agree that the Final Rule will cause immigrant families to disenroll from benefits, including Medicaid, CHIP, and food assistance programs. Even so, Defendants severely underestimate the Final Rule's chilling effects, ignoring extensive and well-documented empirical evidence from prior public charge rules.

121. Although the 2025 NPRM acknowledges that chilling effect studies from 2016-2020 showed affected populations disenrolling from benefits at rates ranging from 4.1 percent to 48 percent, the Final Rule inexplicably asserts a range of 3.3 percent to 17.3 percent, even as it concedes that this range underestimates the likely chilling effect.

122. Compounding the underestimation, DHS uses 10.3 percent as its primary estimate, which is the midpoint between the underestimated low estimate (3.3 percent) and upper estimate (17.3 percent) to reach its predicted impact of 950,124 individuals disenrolling or forgoing enrollment in public benefits. This midpoint is not based on economic modeling that reflects behavioral responses to the policy changes around public charge. In reality, behavioral responses to public charge rulemaking should be expected to vary across programs due to differences in recertification frequency, benefit values, language access, and household versus individual program eligibility. DHS's estimated percentage of individuals who forgo benefits does not include those who are eligible but currently not enrolled, or individuals who are expected to become eligible in future years (due to childbirth, disability, unemployment, aging or income loss). Thus, DHS fails to accurately incorporate or refute the evidence before it in the record and grossly underestimates the magnitude of the expected chilling effect.

123. Defendants fail to quantify the downstream effects or adequately analyze its economic impact, including the negative impacts on state and local programs and hospitals, the grave adverse public health consequences, the severity of the harms to local and state economies and businesses, and the bulk of the countervailing costs attributable to the Final Rule. Commenters opposed the 2025 Public Charge NPRM for each of those reasons, including because reducing federal funds to states for Medicaid, CHIP, SNAP, and SSI—an expected consequence of the Final Rule's chilling effect—would significantly harm state and local economies. Some commenters estimated that the proposed rule would cause state economies to shrink by more than $10 billion and that more than 100,000 jobs would be lost. Commenters noted that the loss of individual and business income could cause state and local tax revenues to fall by $2 billion, making it harder for state and local governments to provide services like education and health care.[25] Defendants fail to adequately consider these economic analyses, instead providing conclusory responses to comments. Defendants also fail to adequately consider the downstream economic and human impacts. Defendants fail to adequately consider lower consumer spending by affected households and the commensurate reduction in state and local economic activities and tax revenue. Defendants relatedly provide no estimates of reduced business and provider revenues driven by reductions in SNAP and WIC, which directly affect local grocery retailers, food production, and food supply chains.

124. The Final Rule also does not include a federalism analysis in violation of Section 6(b) of Executive Order 13132. As discussed in this Complaint, the Final Rule has a significant

[25] *See, e.g.*, American Public Health Association, Robert Wood Johnson Foundation, and Public Health Deans and Scholars' Comments on 2025 Public Charge NPRM at 19, n. 95 (Dec. 19, 2025), https://hpmmatters.publichealth.gwu.edu/sites/g/files/zaxdzs6671/files/2025-12/Public%20Charge%20NPRM%202025_FINAL_121825.pdf.

effect on local economic activity. The Final Rule's conclusion that it "does not have federalism implications because it does not have substantial effects on the states" is entirely at odds with the facts.

125. Defendants fail to adequately consider the significant consequences of individuals forgoing and disenrolling from benefits. Even at the rate that DHS anticipates, the result will be devastating for health, educational, and financial outcomes for Plaintiffs and increased financial and operational burdens on Plaintiffs. Defendants do not adequately consider many of the longer-term costs on a population that will, as a result of the Final Rule, become sicker, poorer, and less educated. The Final Rule improperly dismisses these harms without rationale or explanation, essentially arbitrarily assigning them zero weight in the cost-benefit calculus. Defendants also fail to consider, despite substantiating evidence in the record, that the Final Rule will create a breach of trust with the government, a trust which local governments rely on to combat the spread of communicable diseases, homelessness, and hunger.

126. Defendants fail to consider alternative approaches, which would offer more effective ways to estimate local economic impacts—such as using research on multiplier effects for specific benefit programs.

127. Defendants fail to adequately analyze reliance interests and transition costs. Local governments, such as Plaintiffs, shape their Medicaid and CHIP eligibility determination systems around federal law, but Defendants did not consider how their attempted abandonment of the INA's settled statutory meaning of public charge would disturb that reliance. Defendants likewise fail to adequately consider the investments Plaintiffs have made in educating the public on the contours of the longstanding public charge rule. Because the Final Rule and Policy Alert depart so dramatically from the prior regulatory regime, Plaintiffs must update information about public

charge and benefits use, which confuses beneficiaries, reduces trust in government programs (including health programs that require that trust to operate effectively), and requires that Plaintiffs invest anew in outreach education efforts. As public health and social safety net providers, Plaintiffs also have hundreds of staff—including benefits counselors, interpreters, and hospital staff—who serve Plaintiffs' residents based on the statutory meaning of public charge articulated in the 2022 Rule. Defendants fail to consider these reliance costs of states and localities.

128. Defendants also fail to adequately consider the serious reliance costs to immigrant families. Individual noncitizens and mixed-status families have made medical, educational, employment, and family-planning decisions in reliance on the 2022 Rule and the stable, longstanding definition of the term "public charge" that it codified. Families have enrolled pregnant women and children in Medicaid and CHIP for prenatal and other medical care, applied for food and housing assistance, and accepted federal financial assistance to pay for college, shaping their entire lives around one consistent understanding. Defendants fail to adequately consider and quantify those reliance costs. Defendants' unreasonable expectation that people can disenroll between issuance of the Final Rule and its effective date is not rationally connected to the facts and untethered to the realities on the ground, as Defendants fail to consider the difficulties associated with disenrollment, *i.e.*, that some benefits cannot be disenrolled from or there is no clear disenrollment process. *See infra* at ¶ 129. Moreover, the Final Rule and Policy Alert ignore that some families have made life decisions based on the availability of means-tested public benefits, and the window of time to disenroll is unreasonable given these weighty reliance interests.

129. Moreover, Defendants fail to consider that the Final Rule and the Policy Alert have retroactive effects that are causing and will cause harm. *Bowen v. Georgetown Univ. Hosp.*, 488

U.S. 204, 208-209, 220 (1988); *Landgraf v. USI Film Prods*., 511 U.S. 244, 293 (1994). For example, the Final Rule and the Policy Alert state that means-tested benefit programs applied for prior to the effective date will not count against a noncitizen if they disenroll or seek to disenroll before the effective date. But Defendants fail to consider that some so-called means-tested public benefits such as the Earned Income Tax Credit and free school lunch cannot be "disenrolled" from. As a practical matter, many other programs only offer opportunities for disenrollment on an annual or semiannual basis, and there are certain benefit programs that do not have any or do not have clear disenrollment processes. Expecting individuals to disenroll within such a short time before the effective date of the Final Rule and Policy Alert is unreasonable. Coupled with their breadth and their abandonment of decades of clear, uniform agency standards, the Final Rule and the Policy Alert "take[] away or impair[] vested rights" and "attach[] a new disability in respect to . . . considerations already past." *National Mining Ass'n v. United States DOI*, 177 F.3d 1, 8 (D.C. Cir. 1999). The Final Rule and Policy Alert have "unreasonable secondary retroactivity" that alters the future "in a manner that makes worthless substantial past investment incurred in reliance upon the prior rule." *Bowen*, 488 U.S. at 220 (Scalia, J., concurrence). Because the Final Rule and the Policy Alert operate retroactively, without considering the reality of benefit disenrollment, and fail to recognize or consider their retroactive impacts, the Final Rule and Policy Alert are arbitrary and capricious.

130. Additionally, since 1999, the benefits use of a family member has never been weighted negatively against a noncitizen applicant—not even in the 2019 Rule. Thus, the Final Rule's claim that the reliance interest is not as strong because of the 2019 Rule is not rationally connected to the facts. The Final Rule and Policy Alert also ignore that certain federal programs such as SNAP and Medicaid already assess eligibility on an individual basis and allocate money

only to eligible members of households. The Final Rule and Policy Alert penalize a program-ineligible applicant for their eligible family member's receipt of benefits even though that applicant has already been excluded from the benefits calculation. The Final Rule and Policy Alert undermine family stability and depart from this nation's recognition across many administrations that U.S. citizen children and other eligible family members should be free to access public programs without jeopardizing a loved one's immigration status.

131. The Final Rule and Policy Alert also fail to adequately consider their impact on family well-being and vulnerable populations. Commenters opposed the 2025 NPRM because it would harm families, including children (many of them U.S. citizens) and pregnant women. DHS argues it is essentially reverting the public charge determination to the pre-1999 Guidance status quo. However, Defendants fail to adequately consider the justification and reasoning for the 1999 Guidance. The 1999 Guidance sought to ameliorate the enormous confusion that resulted from the 1996 enactments of PRWORA and IIRIRA, which chilled eligible noncitizens' access to benefits and, in turn, led to significant public health consequences. DHS's failure to acknowledge that a return to the pre-1999 regulatory regime will foster the very same confusion makes the Final Rule and accompanying Policy Alert arbitrary and capricious.

132. The Final Rule and Policy Alert ignore these harms and fail to fully consider the enormous costs they will impose on families with noncitizen members, including mixed-status families with noncitizen and U.S. citizen members.

133. The Final Rule and Policy Alert also fail to account for important differences across programs, including recertification frequency, benefit value, language access, perceived immigration risk, and whether eligibility is determined at the household or individual level. All of

these factors could lead to substantially different chilling effects across different programs, including Medicaid, SNAP, WIC, and housing assistance.

**C) The Final Rule and Policy Alert Are Arbitrary and Capricious, as They Do Not Adequately Address That Supplemental Supports Help Maintain a Healthy and Stable Nation and Do Not Demonstrate Dependency.**

134. The longstanding definition of "public charge," which the Final Rule would upend, ensures that people, including immigrants, are able to participate in essential federal, state, and local benefits programs for which they are eligible that provide supplemental assistance to further public health, nutrition, housing stability, educational, and other public policy goals.

135. As discussed further below, receipt of limited governmental assistance, particularly in the form of food, housing, health insurance subsidies, and education, including state and local benefit programs that Plaintiffs administer, enables all people, including immigrants, their children, and their other family members, to maintain employment, continue healthy and stable lives, and contribute fully to federal, state, and local economies. These limited benefits help citizens and noncitizens alike achieve the stability necessary to support themselves—a condition plainly inconsistent with the state of primary dependence that Congress, courts, and regulators have long understood the term "public charge" to mean.

136. For this reason, the definition of "public charge" has never been understood to encompass temporary receipt of these benefits, and while the Final Rule and Policy Alert assert that immigration officers can consider the duration and recency of the receipt, they neither set limits precluding officers from determining someone a public charge based on their receipt nor provide intelligible standards.

137. The Second Circuit found that programs such as SNAP, Medicaid, and housing assistance "are designed to provide supplemental support, rather than subsistence, to a broad swath

of the population." *New York*, 969 F.3d at 84. "[T]hese programs sweep more broadly than just families on the margin, encompassing those who would no doubt keep their families fed and housed without government support but are able to do so in a healthier and safer way because they receive supplemental assistance." *Id.* at 85 (citing *Cook Cty.*, 962 F.3d at 232). "Accepting help that is offered to elevate one to a higher standard of living, *help that was created by Congress for that precise purpose*, does not mean a person is not self-sufficient – particularly when such programs are available not just to persons living in abject poverty but to a broad swath of low – and moderate-income Americans, including those who are productively employed." *Id.* (emphasis in original).

138. Further, DHS's interpretation of public charge in the Final Rule and Policy Alert to encompass supplemental non-cash supports without clear limitations rests on unsupported speculation, based on "categorical assumptions [that] run counter to the realities of th[ose] non-cash benefits" and thus counter to the evidence before DHS. *Id.* at 83.

139. DHS ignores this important aspect of the problem, rests its decision-making on faulty assumptions counter to the evidence, and fails to provide a reasonable explanation for its change in policy. Accordingly, the Final Rule and Policy Alert are arbitrary and capricious.

**1) Food Programs Like SNAP Provide Supplemental Support, Prevent Health Problems, Promote Healthy Eating Habits, and Are Not a Proxy for Dependency.**

140. Supplemental nutrition benefits are available to a wide range of households with low and moderate incomes, promote positive health outcomes, and prevent conditions like obesity, diabetes, and malnutrition, which can limit an individual's ability to work. These benefits offer targeted and crucial assistance to working families.

141. SNAP is a federal nutritional supplement program that is overseen by USDA but administered in large part at the state and local levels. SNAP benefits are available to low-income residents for purchasing nutritional staples, such as bread and cereals, fruit and vegetables, meats, and dairy products.[26] Receiving SNAP benefits is associated with better self-reported health as well as a lower risk of heart disease and obesity.

142. More than 38 percent of SNAP recipients nationally are in working families.[27] Approximately 10.6 million adults live in households that receive SNAP, and they mostly work full-time schedules.[28] The SNAP program has consistently reduced poverty among its participants, including children.[29]

143. As the Second Circuit noted, supplemental food benefits such as SNAP "are intended for all those whose "financial resources . . . are determined to be a substantial limiting factor in permitting them to obtain a *more nutritious* diet." *New York*, 969 F.3d at 84 (quoting Food and Agric. Act of 1977, Pub. L. No. 95–113, § 1301, 91 Stat. 913, 962; citing 7 C.F.R. § 273.9(a)) (emphasis in original). "Because SNAP is not intended only for those who might otherwise face starvation, the program is open to households with incomes exceeding the federal poverty

[26] *See Supplemental Nutrition Assistance Program (SNAP)*, Off. of Temp. & Disability Assistance, Frequently Asked Questions, http://otda.ny.gov/programs/snap/qanda.asp#noncitizen.

[27] New York: Supplemental Nutrition Assistance Program, Center on Budget and Policy Priorities (Jan. 21, 2025), https://www.cbpp.org/sites/default/files/atoms/files/snap_factsheet_new_york.pdf.

[28] Taml Luhby, *More Amazon and gig workers are turning to SNAP and Medicaid to make ends meet, study finds*, CNN https://www.cnn.com/2026/07/23/economy/medicaid-snap-amazon-gig-workers [archived at https://perma.cc/X75K-3CJD].

[29] *Supplemental Poverty Measure Shows State-Level Impact of Food Stamps*, U.S. Census Bureau (Oct. 25, 2019), https://www.census.gov/library/stories/2019/09/supplemental-poverty-measure-shows-state-level-impact-of-food-stamps.html [archived at https://perma.cc/2UBS-XX34].

guideline," and thus covers large numbers of individuals that, "far from being incapable of productive employment, work for some of America's largest corporations." *Id.*[30]

**2) Use of Health Insurance Programs, Which Increases Access to Preventative Healthcare and Treatment, Does Not Demonstrate Dependency.**

144. "[I]n this country, access to private healthcare depends for many people on whether an employer offers coverage." *New York*, 969 F.3d at 84.

145. Health insurance programs, like Medicaid and CHIP, expand coverage to low-income individuals and families who may otherwise be uninsured. Having access to health insurance increases the likelihood that individuals will seek medical care regularly, receive recommended vaccinations, and receive preventative and potentially life-saving treatment. In contrast, individuals without insurance are more likely to wait to seek healthcare until they are sicker, harder to treat, and more likely to require more expensive emergency services and hospitalizations.

146. Most adults receiving Medicaid are employed and working either full- or part-time.[31] Nearly 14 million adults who worked at some point in 2024 were enrolled in Medicaid.[32]

147. Medicaid's role is particularly important for vulnerable populations and populations with specialized health care needs. Studies have shown that expanded Medicaid access

---

[30] *See also SNAP Helps Millions of Workers in Low-Paying Jobs*, Ctr. on Budget and Policy Priorities (July 30, 2024), https://www.cbpp.org/research/food-assistance/snap-helps-millions-of-workers-in-low-paying-jobs; Elvia Malagon and Lauren FitzPatrick, *Walmart, Amazon and CPS top list of employers where Illinois workers still need SNAP benefits*, CHICAGO SUN-TIMES (Feb. 6, 2026), https://chicago.suntimes.com/news/2026/02/06/walmart-amazon-cps-top-employers-illinois-workers-still-need-snap-benefits-trump-work-requirements-lose-benefits.

[31] *Understanding the Intersection of Medicaid and Work*, KFF, (May 30, 2025), https://www.kff.org/medicaid/understanding-the-intersection-of-medicaid-and-work-an-update/ [archived at https://perma.cc/SY8V-DXZP].

[32] Taml Luhby, *More Amazon and gig workers are turning to SNAP and Medicaid to make ends meet, study finds*, CNN (July 23, 2026), https://www.cnn.com/2026/07/23/economy/medicaid-snap-amazon-gig-workers [archived at https://perma.cc/X75K-3CJD].

is associated with improvement in public health, and in particular with lower mortality rates, better pregnancy and birth outcomes, and higher cancer detection rates.

148. CHIP covers services such as check-ups, vaccinations, blood tests, and X-rays for infants and children, which help to prevent them from developing a lifetime of serious diseases and medical conditions.

**3) Use of Housing Assistance Programs, Which Decrease Displacement and Homelessness, Does Not Equate to Dependency.**

149. Housing benefits programs are "intended to ensure 'a decent home and a suitable living environment for all persons, but principally those of low *and moderate* income.'" *New York*, 969 F.3d at 84 (citing Hous. and Cmty. Dev. Act of 1974, Pub. L. No. 93-383, § 101(c)(3), 88 Stat. 633, 634) (emphasis in original). Indeed, as the Second Circuit pointed out, "while the majority of those using housing programs are low-income families, benefits remain available to those earning up to 80% of the area median income." *Id.* (citing M.T.R. J. App. 164; 42 U.S.C. § 1437a(b)(2)(A)). "It makes little sense to treat the mere receipt of housing benefits as proof of inability to survive by one's own efforts when the program is intended for, among others, people who can and do earn moderate incomes." *Id.*

150. Affordable housing programs decrease housing displacement and homelessness and allow recipients to live in a stable physical environment, which in turn has compounding impacts on public health. *See, e.g. infra* at ¶¶ 273–75.

151. Recipients of public housing benefits often work and do not necessarily receive other governmental assistance.

152. Affordable housing programs also promote employment by providing beneficiaries with stable accommodation, which often provides access to reliable transportation. Individuals

who receive housing assistance are less likely to face chronic tardiness or absenteeism at work or school.

#### 4) Educational Supports for Children Do Not Equate to Dependency and Are Crucial to the Nation's Success.

153. The Final Rule and Policy Alert create enormous uncertainties, ambiguously sweeping in even early childcare and other educational supports that have never been considered for public charge determinations, even under the 2019 Rule. *See, e.g.*, Policy Alert at 65–66 (considering child's receipt of free school lunches in his mother's public charge determination); *see infra* at ¶¶ 241–252. And the Final Rule and Policy Alert fail to provide an intelligible standard for determining whether such programs are in fact means-tested public benefits.

154. Strong evidence shows that early childhood education is foundational to a child's future success. Quality early childhood programs have been shown to be associated with higher academic achievement, reduced grade retention, and a greater likelihood of graduating high school on time.

155. The educational opportunities offered by these programs benefit not only the individual students enrolled, but also their future elementary schools, teachers, and classmates.

156. Use of these and other educational and childcare programs is inconsistent with the idea of primary dependency, as they connect families to services and resources that promote long-term self-sufficiency. By making reliable care available, these programs enable parents to enter and remain in the labor force.

### D) The Lack of a Fair and Transparent Process for the Final Rule and Policy Alert Demonstrates the Arbitrary and Capricious Nature of DHS's Actions.

157. The rulemaking process and the events leading up to the release of the Final Rule and Policy Alert demonstrate the arbitrariness and capriciousness of DHS's actions.

158. DHS acted arbitrarily and capriciously through issuing a 99-page Policy Alert that it did not make available for notice and comment. Additionally, DHS is seeking to bypass necessary congressional oversight and is acting arbitrarily and capriciously through effectively evading the 60-day rule for major rulemaking under the Congressional Review Act, which requires that major rules take effect after 60 days. The Final Rule wipes the slate clean with the rescission of the regulatory texts surrounding the definition of public charge, and then fills the gap with the accompanying subregulatory guidance—which will be in place for fewer than 60 days before the effective date.

159. DHS issued the 99-page Policy Alert just 30 days before its effective date and that of the Final Rule, which is not sufficiently fair notice to the regulated public to make the drastic changes required.

160. The public charge inquiry and the issues associated with it are well known to be complex. *New York*, 969 F.3d at 84 (acknowledging that the questions on public charge before the Second Circuit were complex). Despite knowing the complexities around public charge, its long history, and the proposed sudden change in its policies, DHS conducted its rulemaking on public charge in a rushed and arbitrary manner. Although Plaintiffs and others impacted by the Final Rule submitted comments, those comments could have included more information with more time. The Final Rule claims commenters did not provide the agency quantitative analyses or research that were exactly on point; however, DHS did not give commenters sufficient time to respond in that manner. It is unreasonable, arbitrary, and capricious to expect extensive quantitative analysis or research on such a complex issue in merely 30 days.

161. Additionally, despite taking seven months from the end of the public comment period to issue the Final Rule, Defendants failed to conduct a complete economic impact analysis. *See supra* at ¶¶ 119–23.

### E) To the Extent the Policy Alert Imposes New Obligations, Defendants Failed to Observe Required Procedure.

162. As alleged above, the Policy Alert flows from and implements the Final Rule, and the Policy Alert is contrary to law and arbitrary and capricious for the same reasons as the Final Rule.

163. In the alternative, the Policy Alert is a legislative rule that imposes independent binding legal obligations.

164. Contrary to the Final Rule's claim that the Policy Alert is "nonbinding," guidance published in the USCIS Policy Manual is binding on immigration officers.[33] Indeed, the USCIS states on its website that the Policy Manual contains the "official policies of USCIS" and "is to be followed by all USCIS officers in the performance of their duties."[34] The Policy Alert also states that it is "controlling." Policy Alert at 1. To the extent that the Policy Alert imposes new obligations, substantively amends an existing regulatory regime with the force and effect of law, and produces concrete legal consequences, the Policy Alert is a legislative rule.

165. Even if it were considered on its own, the Policy Alert is contrary to law and arbitrary and capricious for the reasons stated above, including because it adopts an interpretation of public charge that is inconsistent with the plain meaning of the statute as written by Congress and interpreted by the courts and is not an exercise of reasoned agency decision-making.

[33] *Policy Manual*, U.S. Citizenship and Immigration Services (Sep. 11, 2026), https://www.uscis.gov/policy-manual [archived at https://perma.cc/AN6S-TANW].
[34] *Id.*

166. Moreover, the Policy Alert is independently unlawful because Defendants seek to circumvent the rule of law and a fair implementation process through issuance of the Policy Alert without notice and comment. To the extent that the Policy Alert is a legislative rule, Defendants are acting unlawfully by issuing the Policy Alert without engaging in the notice and comment rule making and instead relocating substantive regulatory decisions to subregulatory "policy alerts" and "guidance."

167. To the extent that the Policy Alert is a substantive, legislative rule, Defendants are seeking to bypass necessary congressional oversight through evading the 60-day rule for major rulemakings under the Congressional Review Act, which requires that major rules take effect after 60 days.

168. Executive Order 12866, which provides for presidential review of agency rulemaking via the Office of Management and Budget's Office of Information and Regulatory Affairs, states that the public's opportunity to comment, "in most cases should include a comment period of not less than 60 days." Exec. Order No. 12866, § 6(a), 58 Fed. Reg. 51,735 (Oct. 4, 1993).

169. Defendants did not publish the Policy Alert as a proposed rule or provide Plaintiffs or other interested members of the public with notice and an opportunity to comment before its issuance.

170. Thus, in the alternative, to the extent that Defendants promulgated and implemented a legislative rule without observing the procedures required by the APA, Defendants violated 5 U.S.C. §§ 553 and 706(2)(D), and the Policy Alert should be vacated and set aside on that independent basis.

## I. The Final Rule and Policy Alert Harm Plaintiffs.

171. The Final Rule and Policy Alert have caused, are causing, and will cause harm to Plaintiffs. The resulting benefits disenrollment will undermine public health, increase food insecurity and housing instability, increase costs to medical and hospital systems including those owned and operated by Plaintiffs, and drive up costs for uncompensated healthcare system and shelter services. The Final Rule and Policy Alert will also harm Plaintiffs' economies, and they will inflict substantial and burdensome administrative costs on Plaintiffs' institutions. Additionally, they will undermine Plaintiffs' public health and education efforts.

### 1. The Final Rule and Policy Alert Have and Will Continue to Have a Broad Chilling Effect on Public Benefits Enrollment.

172. Defendants are forcing residents to choose between forgoing supplemental public benefits or risking their and/or their loved ones' immigration statuses. Millions of immigrants are and will be frightened and confused about the potential consequences of applying for benefits and will forgo public assistance altogether, even if the Final Rule and the Policy Alert do not implicate their immigration status. The same is true for their U.S. citizen family members.

173. As discussed above, the Final Rule concedes that it will cause a chilling effect. DHS uses 10.3 percent as its primary estimate for that chilling effect, which is a gross and arbitrary underestimate.

174. With respect to the 2019 Public Charge Rule, Plaintiffs' residents began disenrolling from multiple public benefit programs in early 2018 after the press published a leaked early version of the proposed rule. Residents disenrolled out of fear that participation in programs covered by the leaked draft (and, subsequently, by the 2018 Notice of Proposed Rulemaking and the 2019 Rule) would trigger adverse immigration consequences. For example, New York City saw a significant decline in SNAP enrollment for households with a noncitizen head of household

associated with the 2019 Rule. San Francisco likewise saw a decline of 16 percent in SNAP[35] enrollment for households with noncitizen members. New York City's Mayor's Office of Immigrant Affairs ("MOIA") also confirmed noncitizens' benefit disenrollment and fear of seeking out medical care in response to proposed changes to public charge inadmissibility.

175. In response to the 2025 NPRM, and even before the publication of the Final Rule, the chilling effect had already begun. Earlier this year, families fearing that use of public benefits will have adverse immigration consequences were already retreating from public benefits programs, including withdrawing their children from vital programs.[36] The breadth of the Final Rule and Policy Alert have exacerbated the chilling effect, and the number of immigrants forgoing critical public benefits will only increase.

176. Fear and concern about the Final Rule and Policy Alert are already having a broad and negative impact on the health of noncitizens and their families in New York City. Noncitizens and their families are avoiding or refusing health care benefits and services to which they are entitled. And some individuals and families who would not be affected by the Final Rule and Policy Alert are declining care benefits and services to which they are entitled.

177. For example, frontline staff members from NYC Health + Hospitals, New York City's municipal, publicly funded hospital system, have reported instances in which clients have declined to enroll in public benefits and services due to a stated fear of changes in the public charge definition and determination. Likewise, New York City-based community health center staff have advised NYC Department of Health and Mental Hygiene managers about an increase in no-shows

---

[35] In California, SNAP is referred to as CalFresh. For consistency and to avoid confusion, this Complaint refers to CalFresh as SNAP.

[36] *See, e.g.*, *Immigrant families in California fear losing benefits amid public charge confusion*, MSN (Mar. 23, 2026), https://www.msn.com/en-us/news/other/immigrant-families-in-california-fear-losing-benefits-amid-public-charge-confusion/ar-AA1ZfECK?ocid=BingNewsVerp.

and canceled appointments for clinic visits following the issuance of the Final Rule. The New York City Department of Social Services has also seen a decline in SNAP enrollment for households with a noncitizen head of household after the Final Rule was issued.

178. Even under DHS's conservative estimate of the chilling effect, the Final Rule and Policy Alert will lead thousands of Plaintiffs' residents to disenroll from public benefits for which they are otherwise eligible, with deleterious effects on public health, welfare, and safety. Several Plaintiffs have locally funded safety-net systems or programs—which are intended to supplement, but not supplant, federal benefits programs—that will face substantially heightened costs to meet the needs of these residents.

179. The Final Rule will harm children with at least one noncitizen parent, regardless of the child's citizenship status. Of the 10.5 million U.S. children with at least one immigrant parent, approximately 9.2 million are American citizens by birth.[37] One in four U.S. children, the vast majority of whom are U.S. citizens, has an immigrant parent.[38]

180. Children thrive when their families thrive. When the immigrant parents of citizen children disenroll or decline to enroll in public benefits, their children will suffer too. Experts estimate that about 13.4 million Medicaid/CHIP enrollees live in households with at least one noncitizen, including 5.9 million U.S. citizen children, who may experience increased disenrollment due to fear and misunderstanding of the public charge rule.[39] Under modeled

[37] Jeanne Batalova, Michael Fix & Mark Greenberg, *Chilling Effects: The Expected Public Charge Rule and Its Impact on Legal Immigrant Families' Public Benefits Use*, Migration Pol'y Inst., 4, 23 (June 2018), https://www.migrationpolicy.org/sites/default/files/publications/ProposedPublicChargeRule-Final-Web.pdf [archived at https://perma.cc/W3TD-VFG8].

[38] Drishti Pillai, Akash Pillai, and Samantha Artiga, *Children of Immigrants: Key Facts on Health Coverage and Care*, KFF (May 19, 2026), https://www.kff.org/racial-equity-and-health-policy/children-of-immigrants-key-facts-on-health-coverage-and-care/ [archived at https://perma.cc/9MV7-5Q42].

[39] Comment on *Notice of Proposed Rulemaking: Public Charge Ground of Inadmissibility*, Georgetown University Health Policy Inst. Ctr. for Children and Families, 4 (Dec. 19, 2025), https://ccf.georgetown.edu/wp-

disenrollment scenarios of 10 to 30 percent, experts estimate between 1.3 and 4.0 million individuals could lose coverage, including from 600,000 up to 1.8 million citizen children.[40]

181. Based on an analysis of American Community Survey data, which is known to systematically undercount Medicaid enrollment, King County estimates that tens of thousands or more benefit recipients in its jurisdiction will be chilled.

182. The City of Seattle, located in King County, is the most populated city in King County. Seattle expects a chilling effect on SNAP and Medicaid enrollment. Seattle funds 25 food banks that would see increased demand if SNAP enrollments are chilled. Indeed, the food banks already experienced this during the government shutdown in 2025 when SNAP benefits were paused.

183. DHS is aware of the devastating impact the Final Rule and Policy Alert will have on residents who depend on the public benefits newly included in the public charge determination, including both residents who are directly subject to the Final Rule and those who are not. 91 Fed. Reg. at 45,361–70. But awareness is not analysis, and Defendants fail to adequately consider the harm associated with both groups.

184. Defendants concede that the Final Rule (which encompasses its accompanying Policy Alert) will affect Plaintiffs' residents regardless of whether the Final Rule directly applies to their immigration status. Additionally, DHS concedes that the chilling effect could have consequences and impacts on public benefit usage. 91 Fed. Reg. at 45,361–62. Even at the rate

content/uploads/2025/12/FINAL-CCF-Comments-on-Public-Charge-NPRM-2025.pdf; Samantha Artiga et al., *Potential 'Chilling Effects' of Public Charge and Other Immigration Policies on Medicaid and CHIP Enrollment*, KFF (Dec. 2, 2025), https://www.kff.org/medicaid/potential-chilling-effects-of-public-charge-and-other-immigration-policies-on-medicaid-and-chip-enrollment/ [archived at https://perma.cc/V6NZ-V4CN].

[40] *Id.*

that DHS anticipates, the result will be devastating for health, educational, and financial outcomes for Plaintiffs and increased financial and operational burdens on Plaintiffs.

### 2. The Final Rule and Policy Alert Will Result in Negative Public Health Outcomes.

#### A) The Final Rule and Policy Alert Will Harm Public Health.

185. The NYC Department of Health and Mental Hygiene ("NYC DOHMH") researchers recently published and preprinted the results of a study modeling the likely impacts of the Final Rule on primary care access and premature mortality. The study estimated that the chilling effects caused by the Final Rule will reduce primary care access by 4.1 to 9.9 percent over five years, reduce doctors' visits by 5.1 to 12.2 percent over five years, and increase premature mortality by 4.4 to 10.6 percent over five years, among New York City immigrants under age 65 and US citizen children in mixed-status households.[41]

186. Millions of Plaintiffs' residents rely on enrollment in health insurance programs like Medicaid and CHIP to help pay for the medical care that Plaintiffs provide.

187. In January 2026, Medicaid provided comprehensive insurance coverage to about 6.7 million New Yorkers.[42] Of those New Yorkers, approximately 3.8 million (or about 56.5 percent) were New York City residents.[43] More than one third of Medicaid enrollees statewide are children.[44] New York State provides coverage to eligible children through its own programs, such

[41] Kaveri Nadhamuni et al., *The 2026 public charge rule and long-term health impacts among NYC immigrants: a simulation study* (July 17, 2026), https://www.medrxiv.org/content/10.64898/2026.07.23.26358686v1.full-text [archived at https://perma.cc/A4HR-AWS4].

[42] *NYS Medicaid Enrollment Databook by Month*, New York State Dep't of Health (July 2026), https://www.health.ny.gov/health_care/medicaid/enrollment/docs/by_resident_co/current_month.htm [archived at https://perma.cc/2DGK-25XL].

[43] *Id.*

[44] *New York Medicaid Enrollment by Eligibility Group*, United Hosp. Fund (May 23, 2023), https://uhfnyc.org/our-work/initiatives/medicaid-institute/dashboards/ny-eligibility-category/ [archived at https://perma.cc/9TYQ-WKBY].

as Child Health Plus ("CHP"), as well as through Medicaid.[45] Over 230,000 children in New York City are covered by CHP, and approximately 42 percent of all CHP enrollees statewide live in New York City.[46]

188. In New York City, DOHMH operates ten public health clinics that provide low to no-cost services to patients to ensure that New Yorkers have access to these services regardless of their ability to pay. These clinics are a critical source of care for foreign-born New York City residents. Both DOHMH and NYC Health + Hospitals receive reimbursements from Medicaid. NYC Health + Hospitals, DOHMH, and New York City Department of Social Services ("NYC DSS") assist potential beneficiaries with applying for Medicaid and CHIP/CHP.

189. Based on Defendants' conservative projection that approximately 10 percent of individuals residing in households with noncitizens will disenroll from public benefits, NYC Health + Hospitals estimates that over 16,000 of its patients enrolled in Medicaid or CHP may disenroll out of concern about the Final Rule and Policy Alert. NYC Health + Hospitals expects that patients may use fewer preventative services, resulting in a downstream increase of high-severity and inpatient services over time if patients believe their use of public benefits could endanger their ability to attain immigration relief in the future, or if they believe it may impact the ability of a household member to attain immigration relief in the future. Each of these responses has detrimental consequences for New York City.

190. Through the Chicago Department of Public Health ("CDPH") and the City's partnerships with community-based health centers, Chicago offers a wide variety of preventative, treatment, and health educational services. CDPH receives reimbursements from Medicaid for

---

[45] *Total Enrollment by County Report for March 2026*, Child Health Plus, New York State Dep't of Health, https://www.health.ny.gov/statistics/child_health_plus/enrollment/docs/2026-03.pdf (accessed Sep. 11, 2026).

[46] *Id.*

administrative costs and as a medical services provider. Chicago also seeks Medicaid reimbursement for the Chicago Fire Department, which provides ambulance transportation services to residents, regardless of income and insurance status. CDPH and its Department of Family and Support Services assist potential beneficiaries with applying for Medicaid and CHIP. According to state enrollment data from 2025, over 950,000 Chicago residents—close to 25 percent of the City's population—are enrolled in Medicaid.[47]

191. San Francisco administers myriad public benefits that promote the health of the City's most vulnerable residents. For example, the San Francisco Human Services Agency ("SFHSA") administers Medicaid[48] at the local level. As of December 2025, approximately 45 percent of all Medicaid enrollees in San Francisco—over 90,000 individuals—lived in households with at least one noncitizen. The City of San Francisco estimates that 33 percent of Medicaid enrollees in San Francisco receive some aspect of their medical care through San Francisco's Department of Public Health ("SFDPH").

192. The San Francisco Department of Disability and Aging Services ("SFDAS") administers the In-Home Supportive Services ("IHSS") program, a component of Medicaid that provides personal care and domestic services to people who are aged, blind, or disabled and live in their own houses. In December 2025, there were an estimated over 3,000 noncitizen recipients of IHSS services in San Francisco.

---

[47] *Medicaid Coverage*, Chicago Health Atlas, https://chicagohealthatlas.org/indicators/MCD?tab=map (accessed Sep. 11, 2026).

[48] In California, Medicaid is referred to as Medi-Cal, which is a program that combines federally funded Medicaid with state-only funded pathways to provide coverage for low-income residents, adapting eligibility parameters based on federal guidelines and state-specific legislative expansion. For consistency and to avoid confusion, this Complaint refers to Medi-Cal as Medicaid, and allegations concerning Medicaid for California refer to both the federal and state components of Medi-Cal.

193. Based on Defendants' conservative projections that 10 percent of individuals residing in households with noncitizens will disenroll from public benefits, San Francisco expects to see close to 9,400 people disenroll from Medicaid. And San Francisco expects to see at least hundreds of individuals withdraw from IHSS.

194. Santa Clara owns and operates the largest public health and hospital system (hereafter "Santa Clara Health System") in Northern California and one of the largest in the nation. The Santa Clara Health System's responsibilities include routine, preventive, and emergency medical care across its four acute-general hospitals and 15 major health centers and clinics; preventing the spread of infectious diseases such as tuberculosis (TB) and HIV; maintaining maternal, child, and family health; operating a health plan that provides medical coverage and insurance to a quarter-million people, including through Medicaid; offering mental health and substance use services and coverage; and otherwise promoting healthy communities. More than 350,000 Santa Clara residents are enrolled in Medicaid, of whom more than 150,000 (or about 46 percent) are noncitizens or belong to households with at least one noncitizen member.

195. Through Public Health – Seattle & King County's ("PHSKC") own health centers and its partnerships with other community-based health centers, PHSKC offers a wide variety of preventative, treatment, and health educational services. PHSKC receives reimbursements from Medicaid for administrative costs and as a medical services provider. PHSKC assists potential beneficiaries (adults and children) with applying for Medicaid. According to state enrollment data from 2025, over 350,000 King County residents—close to 16 percent of the county's population—are enrolled in Medicaid. About 4 in 10 children in King County are covered by Medicaid.

196. Based on Defendants' conservative projections that 10 percent of individuals residing in households with noncitizens will disenroll from public benefits, King County expects

to see close to 20,000 people disenroll from Medicaid, SNAP or both, with a significant number of those individuals residing in Seattle, which is the most populous city in King County.

197. By deterring participation in Medicaid, CHIP, and other health insurance programs, the Final Rule and Policy Alert undermine Plaintiffs' interest in improving both short- and long-term health and advancing public health interests for citizens and noncitizens alike.

198. Individuals who disenroll from public benefits for which they are otherwise eligible will be at heightened risk for hunger and adverse health outcomes. They are also likely to delay seeking treatment and more likely to use the emergency department for routine care services, which are far costlier to Plaintiffs' health systems than providing primary or preventative care. Specifically, for example, NYC Health + Hospitals estimates that a 10 percent disenrollment rate could result in over 15,000 fewer annual specialty care visits and 6,000 fewer annual primary care visits.

199. The Final Rule and Policy Alert will endanger health insurance coverage for a substantial number of Plaintiffs' residents and cause significant harm to the public health by dissuading the use of, or enrollment in, insurance coverage. People not seeking health care for fear of accessing treatment directly or due to an inability to pay without Medicaid or CHIP (or the state equivalent) will lead to disruption in treatment and worsen overall physical and behavioral health outcomes among both citizens and noncitizens. This impact will be felt disproportionately among women (including pregnant women), infants, and children due to reduced use of prenatal care services.

200. Children are at particular risk because of the Final Rule and Policy Alert. Access to Medicaid for children confers a range of benefits that relate to improved health, educational, and

economic outcomes, including lower rates of asthma,[49] better access to primary care and ability to fulfill prescriptions,[50] higher high school graduation rates, and improved health as adults.[51] Experts expect long-term negative impacts due to decreased access to Medicaid for eligible children.[52]

201. An increase in uninsured residents will have significant adverse effects on individuals' well-being and the public health in Plaintiffs' communities. Lack of access to primary care endangers not only the health and well-being of noncitizens but also jeopardizes Plaintiffs' ability to safeguard the health of their communities as a whole. For example, uninsured individuals are significantly less likely to obtain routine immunizations, thereby heightening the risk of vaccine-preventable communicable disease outbreaks across the broader population.

202. The Final Rule and Policy Alert will also harm the community health of Plaintiffs and the country by reducing access to preventative and diagnostic treatment of communicable diseases.

203. Currently, measles cases are rising across the country, including in Plaintiffs' communities.[53] NYC DOHMH offers vaccinations, including the measles, mumps, and rubella

---

[49] Owen Thompson, *The long-term health impacts of Medicaid and CHIP*, J. of Health Econ. 26–40 (Jan. 2017), https://pubmed.ncbi.nlm.nih.gov/28040620/.

[50] Elizabeth Williams and Robin Rudowitz, *Medicaid and Children's Health: 5 Issues to Watch Amid Recent Federal Changes*, KFF (Oct. 15, 2025), https://www.kff.org./medicaid/medicaid-and-childrens-health-5-issues-to-watch-amid-recent-federal-changes/.

[51] Edwin Park, Joan Alker, & Alexandra Corcoran, *Jeopardizing A Sound Investment: Why Short-Term Cuts to Medicaid Coverage During Pregnancy and Childhood Could Result in Long-Term Harm*, The Commonwealth Fund 4–5 (Dec. 2020), https://www.commonwealthfund.org/sites/default/files/2020-12/Park_Medicaid_short_term_cuts_long-term-effects_ib_v2.pdf [archived at https://perma.cc/YB9A-8RWF].

[52] *Comment on Notice of Proposed Rulemaking: Public Charge Ground of Inadmissibility*, Georgetown University Health Policy Inst., Ctr. for Children and Families, Comment on Public Charge 3–5 (Dec. 19, 2025), https://ccf.georgetown.edu/wp-content/uploads/2025/12/FINAL-CCF-Comments-on-Public-Charge-NPRM-2025.pdf [archived at https://perma.cc/LR8L-GXX5].

[53] *Measles Update*, New York State Dep't of Health (Sep. 2026), https://www.health.ny.gov/diseases/communicable/measles/ [archived at https://perma.cc/PM4F-QXYG]; Jesse Zanger and Lisa Rozner, *Confirmed case of measles in Manhattan*, NYC DOH says, CBS News (May 7, 2026), https://www.cbsnews.com/newyork/news/manhattan-measles-case/ [archived at https://perma.cc/UB2Q-XM9W]; *San Francisco Department of Public Health Confirms Measles Case in San Francisco Infant*, City and Cnty. of San

combination (MMR) vaccine to their patients. Foreign-born NYC residents account for a majority of patients at NYC DOHMH's immunization clinic, which provides low and no-cost immunizations regardless of immigration status. By discouraging noncitizens and their families from using benefits such as these public health measures necessary to protect against and prevent transmission of measles and other diseases, the Final Rule and Policy Alert will result in decreased rates of vaccination, increased communicable disease transmission, and increases in severe illness, long-term health complications, and deaths, including among children. In addition, these health effects will lead to increased costs borne by Plaintiffs due to hospitalizations, public health responses to outbreaks, and diminished workforces. The Final Rule and Policy Alert compromise our nation's preparedness against, and increase the risk of, measles and other vaccine-preventable disease outbreaks in our country, including in Plaintiffs' jurisdictions.

204. By way of another example, the majority of patients seen at NYC DOHMH's tuberculosis chest centers and the San Francisco Tuberculosis (TB) Clinic are foreign-born. Although Plaintiffs' position is that TB centers and clinics do not fall within the scope of means-tested public benefits because eligibility is not based on income, the open-ended nature of the definition of means-tested public benefits will deter individuals in families with noncitizens from accessing public health services. As a result, the Final Rule and Policy Alert will cause patients to

---

Francisco (Apr. 15, 2026), https://www.sf.gov/news-san-francisco-department-of-public-health-confirms-measles-case-in-san-francisco-infant; *Public Health announces measles case in a Santa Clara County resident*, Cnty. of Santa Clara, Santa Clara Cnty. Pub. Health (Feb. 27, 2026), https://publichealth.santaclaracounty.gov/news/news-release/public-health-announces-measles-case-santa-clara-county-resident [archived at https://perma.cc/BWC4-E5JF]; *Measles Exposure Locations*, Illinois Dep't of Pub. Health (Sep. 11, 2026), https://dph.illinois.gov/topics-services/diseases-and-conditions/measles/exposure-locations.html [archived at https://perma.cc/WJU7-GF2U]; Laine Bergeson, *US 'highly likely' to lose measles elimination status this fall, analysis warns*, Univ. of Minnesota, Ctr. for Infectious Disease Rsh. and Policy (May 6, 2026), https://www.cidrap.umn.edu/measles/us-highly-likely-lose-measles-elimination-status-fall-analysis-warns [archived at https://perma.cc/F23W-J3BU]; *Measles Cases in Washington State*, Washington State Dep't of Health (Aug. 26, 2026), https://doh.wa.gov/you-and-your-family/illness-and-disease-z/measles/measles-cases-washington-state [archived at https://perma.cc/X4MX-4GQJ].

delay seeking TB screenings and care when they develop symptoms of TB—increasing the risk of a TB outbreak.

205. Additionally, NYC DOHMH and the Santa Clara Health System can identify and treat people with latent TB infection through screenings and preventive care paid for by public benefit programs, including Medicaid. That treatment can entirely prevent people with latent TB infection from developing active TB, experiencing symptoms, or becoming infectious. Conversely, when residents forgo primary and preventive care, NYC DOHMH and the Santa Clara Health System cannot identify these patients and therefore cannot act to prevent the development and spread of active TB. The result is greater cost to New York City and Santa Clara to provide more intensive and expensive treatment to more residents infected with active and infectious TB and a greater risk of spread throughout the community.

206. Similarly, in Seattle and King County, PHSKC's TB clinic relies on Medicaid payments to sustain treatment of over 100 active TB cases annually. PHSKC provides over 4,000 patient visits annually to people with Medicaid, as patients need daily supervised medication appointments during the most active phase of treatment. The majority of patient-generated revenue at PHSKC's TB clinic comes from Medicaid payments. By reducing Medicaid enrollment, the Final Rule and Policy Alert will imperil this revenue and increase the spread of TB throughout Seattle and King County.

207. The Final Rule and Policy Alert will also imperil significant progress made in combatting the spread of the HIV/AIDS epidemic by reducing enrollment in Medicaid and thus decreasing access to HIV prophylaxis, testing, and care; chilling participation in federal, state, and local programs and services for people with HIV; and discouraging HIV testing. For example, New York State's Medicaid Program for Persons with HIV assists tens of thousands of New

Yorkers, including many residents of New York City, by providing health care and other supportive services. As another example, Santa Clara participates in the federal Ryan White HIV/AIDS Program, through which the Santa Clara Health System provides HIV care, treatment, and essential services to low-income residents with HIV—often at low or no cost to the residents themselves. But participation in the Ryan White Program requires a patient to be enrolled in other programs for which they are eligible, including Medicaid. Therefore, as the Final Rule causes individuals and families to forgo Medicaid, it will also preclude them from accessing the Ryan White Program for life-saving medication and associated support. Because the care provided through the Ryan White Program also reduces or eliminates the risk of HIV transmission, diminished access to the program also presents concrete risks to other members of the community and imposes hazardous impacts on overall community and public health.

208. Treating persons with or at risk for HIV helps prevent the transmission and acquisition of the virus. By deterring HIV-positive individuals and those at risk for HIV from enrolling in Medicaid and other health insurance programs, noncitizens will not receive life-saving health care and the risk for disease transmission will increase within Plaintiffs' jurisdictions.

209. When large populations of people fall out of the health care system and do not receive health education or counseling, immunizations, prophylaxes, routine testing and screening, or timely treatment for communicable disease, the health of the entire community is placed at risk. Over time, as vaccine access and coverage decrease, the risk of disease outbreaks increases. As Plaintiffs—and indeed the world—know from the Covid-19 pandemic, uncontrolled disease outbreak can inflict devastating, cascading consequences.

210. Fear of interacting with government authorities may also lead noncitizens and their families to refuse to participate in public health inspections. For example, NYC DOHMH conducts

investigations, such as contact tracing, to identify individuals who may have been exposed to infection and to track the spread of communicable disease. In order for contact tracing to be an effective public health tool, community members must be willing to speak to local public health agency staff and provide names and contact information of family members. This requires trust in those governmental agencies, which the Final Rule jeopardizes.

**B) The Final Rule and Policy Alert Will Increase Food Insecurity.**

211. The Final Rule and Policy Alert will cause increased food insecurity, which will result in negative health impacts.

212. New York City administers SNAP benefits through its Department of Social Services under the oversight of the New York State Office of Temporary and Disability Assistance. As of December 2025, approximately 1.74 million NYC residents—about 20 percent of NYC's population—were enrolled in SNAP. Approximately 175,000 of these individuals are noncitizens legally residing in New York City and legally eligible to receive SNAP.

213. Chicago administers SNAP benefits through its Department of Family and Support Services under the oversight of the Illinois Department of Human Services. As of December 2025, over 500,000 residents of Chicago—roughly 22 percent of the city's population—were enrolled in SNAP. Many of these individuals are noncitizens lawfully residing in Chicago and legally eligible to receive SNAP.

214. In San Francisco, the City's Human Services Agency administers SNAP at the local level. As of December 2025, over 100,000 individuals in San Francisco were enrolled in SNAP. Over 20 percent of these SNAP recipients—more than 20,000 individuals—are members of households with at least one noncitizen member.

215. Santa Clara administers SNAP through its Social Services Agency. SNAP helps approximately 130,000 Santa Clara residents feed their families every month. Over half of all Santa Clara residents who receive SNAP benefits are either children under the age of 18 or seniors aged 65 or older. Of Santa Clara's 130,000 SNAP enrollees, roughly 29,000, or 22 percent, are noncitizens or within households with at least one noncitizen. This figure includes many U.S. citizen enrollees in mixed-status households. The average SNAP-enrolled household in Santa Clara has between one and two members. For households of these sizes, the minimum monthly allotment is as low as $24.

216. Seattle administers Fresh Bucks through its Office of Sustainability and Environment. While different from SNAP, Fresh Bucks serves over 17,000 income-eligible Seattle families with produce benefits that can be redeemed at farmers' markets and participating supermarkets.

217. Plaintiffs have made a concerted effort to increase SNAP enrollments among vulnerable residents living with food insecurity. For example, between June 2022 and June 2025, Santa Clara's affirmative efforts achieved a 21 percent increase in SNAP enrollment. The Final Rule and Policy Alert deter families from using SNAP and threaten to roll back this progress.

218. By penalizing immigrant participation in public benefit programs, such as SNAP enrollments, the Final Rule and Policy Alert undermine Plaintiffs' interest in combatting food insecurity.

219. For example, based on Defendants' conservative projections that 10 percent of individuals residing in households with noncitizens will disenroll from public benefits, NYC expects to see 34,000 individuals disenroll from SNAP. San Francisco expects to see almost 2,400 individuals disenroll from SNAP. This will have cascading effects on household nutrition. For

example, among other programs, NYC DOHMH operates the Health Bucks program, which provides SNAP recipients with coupons to purchase fresh, locally grown produce. For every $2 spent at New York City farmers' markets using a SNAP EBT card, an individual automatically receives $2 in Health Bucks, up to $10 per day. In 2024, over 800,000 Health Bucks (valued at more than $1.6 million) were distributed through the farmers' market SNAP incentive program, increasing low-income New York City residents' access to fresh produce.

220. New York City households that disenroll from SNAP would no longer accrue Health Bucks from DOHMH. While the Final Rule and Policy Alert will cause individuals and families to forego SNAP benefits, these individuals must then also forego access to fresh produce through Health Bucks, unless they are able to access small amounts of Health Bucks through the community-based organizations that participate in the Health Bucks program. And even then, it is unclear whether that access will be considered in the public charge determination, which may cause individuals to forgo such access altogether and worsen their health outcomes.

221. Food insecurity is closely associated with a disproportionately high risk of poor health. The effect of the Final Rule and Policy Alert on SNAP enrollment negatively affects the most vulnerable members of a household, including U.S. citizen children. Food insecurity has particularly harmful impacts on the health, development, and overall well-being of children. For example, children in food-insecure households are more likely to be sick and experience increased behavioral and emotional issues, and are less likely to perform well in school.[54] Indeed, food-insecure children are more likely to experience poor physical and mental health compared to children in food-secure families, including increased risk for anemia, asthma, and depression—

[54] *The Impact of Poverty, Food Insecurity, and Poor Nutrition on Health and Well-Being*, Food Res. & Action Ctr. 1 (Dec. 2017), http://frac.org/wp-content/uploads/hunger-health-impact-poverty-food-insecurity-health-well-being.pdf.

representing just a portion of the long-term implications that loss of SNAP benefits will have on citizen and noncitizen children growing up in these households.[55]

222. WIC is a federally funded nutrition program for women who are pregnant, breastfeeding, or have recently had a baby, and for infants and children under five years of age. As established by Congress, the WIC program provides essential food supplements to all eligible low-income women and children regardless of immigration status.

223. NYC Health + Hospitals operates 10 WIC sites at hospitals and clinics across NYC, within an aggregate target case load of over 50,000 recipients per year.

224. King County also administers WIC, supporting approximately 39,000 mothers and children through healthy foods, nutrition education, breastfeeding support and connections to additional resources and programs.

225. San Francisco, Chicago, and Santa Clara operate WIC programs as well.

226. Because fewer noncitizen mothers and their children will participate in WIC, both will be at risk of birth complications, malnutrition, and even death. Moreover, noncitizen mothers will not receive other health supports that WIC provides, like breastfeeding support services. By deterring noncitizen mothers from accessing these services, the Final Rule and Policy Alert will put children at greater risk of short- and long-term adverse health effects that are correlated with reductions in breastfeeding, including diabetes, obesity, and chronic disease, as well as reduced cognitive development.

[55] Clare E. Holley and Carolynne Mason, *A Systematic Review of the Evaluation of Interventions to Tackle Children's Food Insecurity*, 8 Current Nutrition Reports 1 (Mar. 4, 2019) https://pmc.ncbi.nlm.nih.gov/articles/PMC6426823/.

**C) The Final Rule and Policy Alert Will Increase Housing Instability and Increase the Risk of Homelessness.**

227. The Final Rule and Policy Alert's inclusion of all means-tested public benefits, including housing subsidies (whether federal, state, or local), in the public charge determination will deter eligible individuals and their families from participating in affordable housing programs. Those deterred from participating in housing programs because of the Final Rule and Policy Alert will face substantial challenges in securing affordable housing and avoiding homelessness. These harms are particularly acute in Plaintiffs' jurisdictions, where the housing markets are plagued by extremely low vacancy rates and high rents.

228. Housing programs help stabilize families financially to better achieve self-sufficiency and maintain their health and wellbeing. Some state and local housing benefits are also targeted to specific populations such as survivors of domestic or intimate partner violence, and the housing benefit acts not as income maintenance, but a necessary avenue to establish a new household free from an abusive partner.

229. By causing individuals and families to disenroll from public housing benefits, the Final Rule and Policy Alert will lead to a rise in homelessness among noncitizen and mixed-status families.

230. Housing subsidies help reduce the risk of becoming homeless for at-risk families and help ensure that families living in subsidized housing are much less likely to remain in a homeless shelter or on the street than families without a housing subsidy.

231. Further, housing insecurity has negative health impacts. Scarcity in affordable housing can cause families to cohabitate in crowded, multi-family households, which can have negative health effects from overcrowding and stress.

232. Housing instability and homelessness further contribute to severe stress and mental health issues, including depression and anxiety—health issues that may follow children into adulthood. Indeed, homelessness has a particularly adverse impact on children and youth including poor physical, social, and mental health outcomes, cognitive development, and educational outcomes. In addition, schooling for homeless children is often interrupted and delayed, with homeless children being twice as likely to have a learning disability, repeat a grade, or be suspended from school. Additionally, children who experience housing instability are more likely to experience economic insecurity in adulthood.

233. Housing programs that Plaintiffs administer are essential to reducing homelessness and promoting stability, safety, and health by ensuring housing accommodations that families can afford.

234. For example, Section 8 Housing Choice Vouchers Program ("HCV") funded by the U.S. Department of Housing and Urban Development provides rent subsidies to vulnerable residents in Plaintiffs' jurisdictions, including very low-income families, the elderly, individuals with disabilities, and those in shelters or at risk of becoming homeless, including survivors of domestic violence, so that they can afford safe and sanitary housing in the private market.

235. The Chicago Housing Authority ("CHA") currently receives 95 percent of its funding from HUD, most of which supports housing voucher programs.

236. The San Francisco Housing Authority administers public housing, including for the HCV program. As of June 2026, there were over 4,000 individuals residing in households receiving public housing benefits where at least one household member was a noncitizen.

237. In Seattle, the Homelessness Prevention Program administered by the City of Seattle Human Services Department serves income-eligible households, providing short-term

rental assistance, case management, and eviction prevention services, as well as referrals to other services.[56]

238. Housing costs have risen sharply in recent years. For example, in New York and San Francisco, where even middle-class families struggle to find affordable housing options, programs like Section 8 and public housing offer tools to correct the effects of skewed market forces.

239. By causing individuals and families to disenroll from federal public housing benefits, the Final Rule and Policy Alert will put Plaintiffs at greater risk of homeless populations and housing insecurity.

240. Ultimately, the Final Rule and Policy Alert ignore the robust evidence that housing assistance does not render families reliant on the government but rather helps to stabilize them and put them on the path to self-sufficiency.

**D) The Final Rule's Chilling Effect Impedes Access to Education and Will Harm Many Children.**

241. Public early childhood programs maximize educational opportunities for children, ensure that children are prepared for school, help prevent against summer learning loss and help support families in their professional and educational pursuits.

242. For example, NYC Public Schools ("NYCPS") meets early childhood needs by offering Extended Day and Year ("EDY") seats to eligible children in its 3-K and Pre-K programs[57]; these seats are funded through the Child Care and Development Block Grant Act of

[56] The City of Seattle also administers the Utility Discount Program (UDP), providing discounts on utilities such as electricity, water service, sewer service, and garbage collection to income-eligible households holding a Seattle Public Utilities or Seattle City Light account. The Utility Discount Program offers a savings of 60 percent on electric bills and 50 percent on water, sewer, and garbage bills.

[57] New York City's 3-K and Pre-K programs are free, publicly funded early childhood education programs for three-and-four years old, respectively.

1990 ("CCDBG"). Families must demonstrate eligibility to qualify for a 3-K or Pre-K EDY seat, which include proving that they are low-income. NYCPS also uses CCDBG funding to offer early childhood education to eligible infants and toddlers, enabling them to receive services for 8–10 hours per day, year-round. Because these Infant/Toddler seats are supported by CCDBG funds, families must satisfy the same eligibility criteria as for the 3-K and Pre-K EDY programs.

243. All Infant/Toddler and 3-K/Pre-K EDY programs in NYC are required to conduct developmental screenings within 45 days of a child's enrollment. This tool serves to identify potential risks for developmental delays, which helps inform individuals of the appropriate resources, supports, and/or interventions for students and families. Programs and families may use this information to determine whether a referral to NYC's Early Intervention program (children ages 0–3) or a referral for Preschool Special Education Services (ages 3–5) might be appropriate. Children referred to these programs receive free evaluations to determine whether they are eligible to receive special education services, and, if they are, arrangements are made for them to begin receiving those services.

244. San Francisco's Department of Children, Youth and Their Families ("SF DCYF") funds afterschool programs that offer children athletic, artistic, and academic support and enrichment after the end of the school day and connect families to healthcare resources, clinicians, and other city programs. For those DCYF-funded afterschool programs that charge fees, low-income residents are eligible for waivers of the fees. Children from low-income families are also able to take advantage of free afterschool meals.

245. Seattle offers the Seattle Preschool Program (SPP) through its Department of Education and Early Learning and is a partnership with a network of independent preschool providers and Seattle Public Schools. SPP provides free or low-cost preschool to all Seattle

families with children between 3 and 5 years old, or until eligible for kindergarten. Tuition is calculated by annual income, with many families receiving free preschool tuition. The educational opportunities offered by these programs benefit not only the individual students enrolled, but also their future elementary schools, teachers, and classmates.

246. King County operates a comprehensive support program called Best Starts for Kids (Best Starts). Best Starts is a King County voter-approved initiative intended to support every baby born or child raised in King County to reach adulthood happy, healthy, safe, and thriving. To date, Best Starts has served more than half a million King County children, youth, young adults, and families. Best Starts includes a means-tested childcare subsidy program which provides access for children who are not otherwise eligible for existing federal, state, or local subsidy programs or for whom these programs are insufficient. The educational and health opportunities offered by Best Starts benefit not only the individual children and families enrolled, but also their future elementary schools, teachers, classmates and co-workers. Best Starts also enables parents to enter and remain in the labor force, support development of healthy minds and bodies, and represents deep King County taxpayer commitment to and investment in building a thriving community now and in the future.

247. Many low-income families who avail themselves of these programs have limited public alternatives to ensure that their children can access early childhood education.

248. A chilling effect on the use of educational and childcare support programs will undermine the ability of programs to reach families most in need of these services, causing harm to their children. It would also undermine those programs' ability to plan for the equitable provision of high-quality early childhood services for all children and families and would waste valuable resources that have been committed.

249. Based on DHS's conservative 10.3 percent disenrollment projection, NYCPS estimates that families would withdraw over 1,000 children from these early education and infant/toddler programs. This result would cause tremendous harm to those children and impede NYCPS's mission.

250. San Francisco also works diligently to tailor afterschool programming to meet the needs of individual communities, including offering newcomer services to provide children with additional English-language and academic support. As a result of the Final Rule, immigrant families—particularly low-income families—are likely to disenroll from these afterschool programs, depriving children of critical social, athletic, and academic development opportunities, and leaving working parents without afterschool childcare.

251. Seattle and King County also expect the Final Rule and Policy Alert to create a chilling effect on enrollment in the Seattle Preschool Program and King County's Best Starts program.

252. These early childhood programs perform a crucial function in helping identify children's developmental delays early and allowing families to avail themselves of services, including free evaluations and services for eligible students with disabilities. In identifying students who may have a disability early on, these programs perform essential work: they arm families with knowledge and the ability to seek services aimed at preventing developmental gaps from widening. Forgoing participation in these programs due to fear will result in families and children missing important opportunities for support, which could be to the long-term detriment of their children.

### 3. The Final Rule and Policy Alert Will Harm Plaintiffs' Economic Interests.

253. The Final Rule and Policy Alert will cause Plaintiffs to suffer massive federal funding cuts, significant economic ripple effects, and thousands of lost jobs.

254. Noncitizens account for a significant share of the United States and Plaintiffs' workforce, contribute billions of dollars in income tax revenue each year, and provide billions of dollars to the economy in spending power. Immigrant families and communities are vital to economic growth and supporting Plaintiffs' and other local economies.[58]

255. The Final Rule and Policy Alert will result in significant financial losses to Plaintiffs and their hospitals, negatively impact Plaintiffs' workforce, and decrease economic productivity.

#### A) The Final Rule and Policy Alert Will Result in Financial Losses to Plaintiffs' Hospitals and Increase their Costs.

256. The Final Rule and Policy Alert will increase healthcare costs and reduce revenue for Plaintiffs' hospitals by shifting those costs away from health coverage programs and onto hospitals and state and local governments. Specifically, the Final Rule and Policy Alert will cause individuals who are eligible for Medicaid or Emergency Medicaid to decline to enroll, with the result that when those individuals do eventually seek care, there will be no payor and Plaintiffs' hospitals will need to absorb the costs of uncompensated care. And because individuals without health care are much more likely to forgo cost-effective preventative care and wait longer to seek care, the care residents eventually receive in emergency rooms is more costly.

257. NYC Health + Hospitals estimates that if DHS's conservative projection of 10.3 percent of potentially affected Medicaid enrollees were to drop their health insurance, more than

---

[58] *See, e.g.*, Office of the New York City Comptroller, *Facts, Not Fear: How Welcoming Immigrants Benefits New York City* (Jan. 4, 2024), https://comptroller.nyc.gov/reports/facts-not-fear-how-welcoming-immigrants-benefits-new-york-city/ [archived at https://perma.cc/T5EK-TLD7].

16,000 insured patients would become uninsured and NYC Health + Hospitals would face a significant financial loss as a result in the first year of the Final Rule being in effect. Due to the Final Rule and Policy Alert, NYC Health + Hospitals estimates that it could lose tens of millions of dollars in direct patient care revenue as a result of providing uncompensated care to these newly uninsured patients. MetroPlus, the managed care plan that is a wholly-owned subsidiary of NYC Health + Hospitals, serves over 600,000 New York residents, and would also experience a negative financial impact related to decreased enrollment.

258. San Francisco's Department of Public Health operates two hospitals. Zuckerberg San Francisco General Hospital ("ZSFGH") is a licensed general acute care hospital and Level I trauma center, and provides care to approximately one in eight San Franciscans a year, regardless of immigration status or ability to pay. Laguna Honda Hospital is a skilled nursing and rehabilitation center that provides a full range of skilled nursing services to adult residents of San Francisco who are disabled or chronically ill. SFDPH also operates clinics that provide medical care to San Francisco residents. Assuming Defendants' understated disenrollment projection of 10 percent, San Francisco expects that there will be a decline in Medicaid expenditures of approximately $26 million associated with disenrolled SFDPH patients. Because SFDPH receives a portion of these expenditures as revenue, it expects to experience a significant decline in revenue attributable to the Final Rule.[59]

259. As a provider of last resort, SFDPH offers care to low-income and other vulnerable residents regardless of their ability to pay. SFDPH is mandated by law to provide emergency care to all persons in need of medical care, regardless of ability to pay. If the individuals who disenroll

[59] This estimate is based on the U.S. Centers for Medicare & Medicaid Service (CMS) report on Medicaid Per Capita Expenditure that overall 2023 Medicaid per capita expenditure in California was $8,420. Expenditure estimates exclude direct state administrative expenditures, but administrative overhead for Medicaid Managed Care Organizations is included.

from Medicaid as a result of the Final Rule are required to seek medical care, SFDPH estimates that it will incur about $7 million (at 10 percent disenrollment) in uncompensated charity care costs.

260. Uninsured residents in Chicago require massive expenditures from the City of Chicago. In 2024, the City of Chicago provided approximately 50,000 ambulance transports to Chicago residents for whom no insurance was identified resulting in net charges of approximately $170 million, for which the City of Chicago collected only about $5 million—a loss of over $168 million. The Final Rule and Policy Alert will only exacerbate this loss further.

261. The Santa Clara Health System includes four general acute-care hospitals, 15 major health centers providing a comprehensive array of services, and specialty care clinics. Santa Clara's hospitals and clinics serve a disproportionate number of low-income patients and provide care in underserved areas and to vulnerable populations. In many cases, the cost of providing patient care is wholly or partially uncompensated and therefore absorbed by the County itself, especially where patients cannot or do not enroll in Medicaid.

262. The Santa Clara Health System will directly experience the harmful financial impacts of the Final Rule, including increased uncompensated care. In fact, the Santa Clara Health System's average cost per patient day is substantially higher for uninsured patients than for insured patients because of the higher acuity and intensity of the needs that uninsured patients present in emergency departments after having forgone routine and preventive care. For example, last year the Health System's cost per day to treat patients admitted to the hospital was approximately 15 percent higher for uninsured patients than for all patients taken as a whole.

263. Santa Clara itself absorbs the overwhelming majority of the costs of treating uninsured patients in the form of uncompensated care—meaning Santa Clara incurs those costs

but receives no offsetting revenue. Well over 90 percent of the hospitals' total cost to provide care to uninsured patients on an outpatient basis is uncompensated, and the percentage is even higher for those admitted to the hospitals.

264. Moreover, because the Santa Clara Health System serves as the safety-net hospital system for the Santa Clara Valley region, applicable law and policy dictate that the Health System will provide care to all patients who present in its hospitals' emergency departments—regardless of their ability to pay, and regardless of whether they are eligible for and complete enrollment in health coverage once they present.

265. Residents' disenrollment due to fear of public charge will financially injure Santa Clara in other concrete ways. Santa Clara owns and operates the Valley Health Plan ("VHP"), which is a publicly sponsored health plan that provides healthcare coverage to almost a quarter of a million members, the vast majority of whom are enrolled in a Medicaid managed care plan. Valley Health Plan is financially responsible for all of these members' covered healthcare costs, regardless of their magnitude, and in exchange it receives a specified, set, per-capita ("capitated") sum. As individuals and families disenroll from Medicaid managed care plans, Santa Clara will experience a direct and specific reduction in revenue. If 10.3 percent of VHP members enrolled in managed care plans disenroll, Santa Clara's revenue will decline by more than $6 million per month, or $72 million per year. Yet notwithstanding that decline, Santa Clara will still incur and absorb the cost of treating those patients when they present in the hospitals' emergency departments for medical and behavioral healthcare.

266. More broadly, when considering the entire population (not just those enrolled in the Valley Health Plan), Santa Clara estimates that if 10.3 percent of Medicaid enrollees who are noncitizens or live in households with at least one noncitizen were to drop their health insurance,

approximately 19,000 insured patients would become uninsured, resulting in both lower revenue and higher costs across the Santa Clara Health System and other components of the county organization.

267. PHSKC expects increases in direct costs from uncompensated care as a result of the Final Rule and Policy Alert. Pursuant to state law and regulations, PHSCK must provide health care services to all at its health centers, including medical and dental care. PHSKC cannot withhold these services even if the patient cannot pay for them. PHSKC bills Medicaid and other payors for clinical services provided to insured patients. However, as explained above, a reduction in insurance enrollment will likely result in an increase in uncompensated care. Thus, PHSCK anticipates that it will need to bear the cost of providing this care.

**B) The Final Rule and Policy Alert Will Shift Other Costs for Healthcare, Food, and Shelter to Plaintiffs.**

268. The Final Rule and Policy Alert will shift the costs of providing necessary care and emergency food and shelter to Plaintiffs. Plaintiffs will directly incur the costly consequences of the Final Rule and its chilling effect—including in the forms of higher rates of uncompensated medical and behavioral healthcare; a population with poorer nutritional, educational, and economic outcomes and opportunities and correspondingly more intensive and acute needs; a shift away from cost-effective and community-protective preventive and routine care toward more expensive, more intense, and less effective emergency treatment; increase in food banks or food pantries due to the chilling effect on SNAP; and reduced revenue.

269. Plaintiffs will also be responsible for the substantial financial burden of increased health care costs associated with the decline in SNAP and WIC usage. Children who grow up with resulting higher rates of disease and malnutrition will likely need to rely on health care provided by Plaintiffs to treat these long-term issues.

270. For example, NYC DOHMH expects increases in direct costs to the agency from uncompensated care as a result of the Final Rule and Policy Alert. Pursuant to New York law and regulations, DOHMH must provide health care services through its own staff (or third parties), including for children's vaccinations and for testing and treatment for sexually transmitted infections and tuberculosis. DOHMH cannot withhold these services even if the patient cannot pay for them.

271. DOHMH bills Medicaid and other payers for clinical services provided to insured patients. However, as explained above, a reduction in insurance enrollment will likely result in an increase in uncompensated care. Thus, DOHMH anticipates that it will need to bear the cost of providing this care. Furthermore, as patients decline to seek medical services at early intervention stages and instead seek care as their symptoms become more acute, DOHMH will bear the increased burden of treating advanced stages of disease.

272. Relatedly, there is an attendant and compounded cost that is ultimately borne by Plaintiffs when community members are reluctant to access or avoid basic infectious disease testing and care. In these circumstances, infection continues to spread within the community, thereby increasing the number of individuals in need of medical care and whom Plaintiffs must treat.

273. The lack of participation in affordable housing programs will also increase emergency shelter use, which will place a substantial financial strain on states and local governments, including Plaintiffs. It is significantly more expensive to house a family in an emergency shelter than to provide long-term housing through either public housing or Section 8.

274. By way of example, an August 2025 analysis indicates that for every 100 households earning less than or equal to 30 percent of the area median income in Chicago, there

were only 24 affordable and available units (a deficit of over 100,000 units). Absent stable housing, costs are passed on to the City of Chicago in the form of increased emergency shelter use, longer hospital stays, and mental-health service burdens.[60]

275. As another example, as discussed above, by causing individuals and families to disenroll from federal public housing benefits, the Final Rule and Policy Alert will put hundreds of San Francisco residents at greater risk of homelessness and housing insecurity. These individuals will become increasingly reliant on City-funded services—including temporary shelter and crisis interventions (such as food, hygiene, and overnight safe parking), time-limited rapid-rehousing subsidies, and permanent supportive housing. San Francisco estimates that it would incur millions of dollars in additional costs to meet the needs of these families.

**C) The Final Rule and Policy Alert Will Negatively Affect the Labor Force.**

276. Deterring noncitizens from enrolling in Medicaid and other health insurance programs will negatively affect the workforce. Without routine, preventive health care, employees will be more likely to miss work because of their own illnesses or because they have to care for sick family members. This instability in the workforce will diminish economic productivity.

277. The increase in uninsured workers will significantly affect the health care industry, which disproportionately employs immigrants in positions such as nursing and home-health aides. In New York, currently more than 50 percent of employees in these fields are immigrants.[61] Harms to this workforce will have cascading impacts in the fields and markets where these workers are employed.

---

[60] Jonathan D. Ware, *No Room to Rent: Chicago's Affordable Housing Crisis for Extremely Low-Income Families*, Chi. Housing Authority Research Lab at 4 (August, 2025), https://www.thecha.org/sites/default/files/2025-08/No-Room-to-Rent-CHA_08.25_Transparency.pdf [archived at https://perma.cc/R7M7-JFXH].

[61] Step Two Policy Project, *The Importance of Immigrants in New York's Healthcare Workforce* (Aug. 4, 2025), https://www.steptwopolicy.org/post/the-importance-of-immigrants-in-new-york-s-healthcare-workforce.

278. Because home health agencies and nursing homes often do not provide employer-sponsored insurance, their employees are more likely to be enrolled in Medicaid. A sicker health-care workforce may result in a labor shortage, harming the workers and the individuals cared for by the workers.

279. The decrease in Medicaid, SNAP, and WIC enrollment for children, which will worsen health outcomes, will also impede their academic success, and thus limit their economic contributions in the future.

280. Additionally, the decrease in safe and stable housing interferes with children's educational and financial prospects.

**D) By Chilling SNAP Enrollment, The Final Rule and Policy Alert Will Decrease Economic Productivity.**

281. Research has shown that SNAP helps to stimulate state and local economies. The SNAP program has a direct economic multiplier effect. For every one dollar in SNAP benefits received, there is an approximate $1.54 to $1.79 in increased economic activity.[62]

282. The Final Rule and Policy Alert will cause Plaintiffs to suffer massive federal funding cuts, and significant economic ripple effects, including thousands of lost jobs. Because of the direct economic multiplier effect, and the amount of SNAP dollars spent in Plaintiffs' economies, Plaintiffs will feel a direct financial impact from loss of revenue.

283. Indeed, SNAP benefits stimulate economic activity when they are spent and circulate in the local economy. The U.S. Department of Agriculture concluded in 2019 that SNAP

[62] U.S. Department of Agriculture: Economic Research Service, *Supplemental Nutrition Assistance Program (SNAP) – Key Statistics and Research* (Aug. 31, 2026), https://www.ers.usda.gov/topics/food-nutrition-assistance/supplemental-nutrition-assistance-program-snap/key-statistics-and-research [archived at https://perma.cc/47TX-TJQ3]; Kenneth Hanson, *The Food Assistance National Input-Output Multiplier (FANIOM) Model and Stimulus Effects of SNAP*, U.S. Dep't of Agric., at iv (Oct. 2010), https://www.ers.usda.gov/publications/44749 [archived at https://perma.cc/4ZWV-CK23].

had a substantial beneficial multiplier effect on the economy: every dollar spent on SNAP benefits increased Gross Domestic Product by $1.54.[63] And more recent, peer-reviewed research found that SNAP benefits had a marginal value of *sixty-two*—meaning that the net benefit of SNAP for recipients—measured in terms of immediate nutritional health and longer-term effects on behavioral, health, economic, educational, and other outcomes—is *sixty-two times* the net cost of the program.[64] These beneficial multiplier effects will disappear as individuals forgo or disenroll from SNAP.

284. For example, in 2024, nearly $7.5 billion in federal SNAP dollars were spent in New York State at thousands of authorized retailers, including supermarkets, grocery stores, and convenience stores.[65] New York City estimates that approximately 175,000 eligible noncitizens receive SNAP. Even estimating that only 10 percent of households headed by a noncitizen would disenroll in SNAP, the Final Rule and Policy Alert's chilling effect will cost New York City millions of dollars in federal funding, thousands of jobs lost, and millions of dollars in reduced economic activity in New York City overall. Similarly, the average Illinois SNAP recipient received about $192 a month (or $6.33 a day) in fiscal year 2022, and thus, Chicago, for example, would also feel a direct, financial impact from loss of revenue.[66]

---

[63] Patrick Canning and Rosanna Mentzer Morrison, U.S. Dep't of Agric., Econ. Rsch. Serv., *Quantifying the Impact of SNAP Benefits on the U.S. Economy and Jobs* (July 18, 2019), https://www.ers.usda.gov/amber-waves/2019/july/quantifying-the-impact-of-snap-benefits-on-the-u-s-economy-and-jobs.

[64] Martha J. Bailey, et al., *Is the Social Safety Net a Long-Term Investment? Large-Scale Evidence From the Food Stamps Program*, Nat'l Lib. of Med.: Nat'l Ctr. For Biotech. Info. (Sep. 13, 2024), https://pmc.ncbi.nlm.nih.gov/articles/PMC11395512/.

[65] New York State Comptroller, *Federal Funding and New York: Nutritional Assistance* {Sep. 11, 2026), https://www.osc.ny.gov/reports/budget/fed-funding-ny/nutritional-assistance [archived at https://perma.cc/TDF7-LF6S].

[66] U.S. Dep't of Agric., Food & Nutrition Admin., *SNAP Retailer Management Year End Summary FY 2024*, (Sep. 11, 2026), https://www.fns.usda.gov/data-research/data-visualization/snap-retailer-management-dashboard-fy24 [archived at https://perma.cc/B4XK-QSY4.

285. Similarly, based on Defendants' conservative 10.3 percent disenrollment projection, San Francisco's economy is projected to lose approximately $7 million as thousands of residents disenroll from

**4. The Final Rule and Policy Alert Imposes Programmatic and Administrative Burdens on Plaintiffs.**

286. The Final Rule and Policy Alert have imposed and will impose significant programmatic, administrative, and financial burdens on Plaintiffs. Local government agencies administer public benefits programs implicated by the Final Rule, and the Final Rule and Policy Alert severely undermine their goals. For example, NYC Department of Social Services will no longer be able to consistently forecast workload or make projections about public benefits caseloads due to the significant chilling effect. NYC DSS will likely experience high volumes of sudden case closures along with increased application volatility, inhibiting the agency's ability to accurately project staffing needs, which could impact service delivery and error rates.

287. The Final Rule and Policy Alert have already negatively impacted several of Plaintiffs' agencies, given the staff time and resources required in attempting to parse the language in the Final Rule and Policy Alert and their impacts on the agency, the programs the agency operates, and the residents who benefit from them.

288. Plaintiffs will need to undertake significant efforts and investments to educate agency staff and conduct outreach to the public on the Final Rule and Policy Alert. Indeed, although DHS significantly underestimates the costs of familiarizing individuals with the Final Rule and Policy Alert, it acknowledges these costs exist and will burden a wide variety of Plaintiffs' entities. For example, NYC Health + Hospitals will incur significant costs to implement the Final Rule and the Policy Alert, which will include costs for staff training, outreach, preparation of materials, and potentially additional financial counseling to support its patients.

289. Plaintiffs' agencies will have to divert staff resources to educate vulnerable communities and address increased call volume and traffic from concerned residents because of the Final Rule and Policy Alert.

290. For example, training will be critical for NYC DSS staff to address potential public charge implications to applicants before they complete the eligibility process. NYC DSS will have to invest significant resources and employee time to train the approximately 9,000 agency staff as well as approximately 10,000 provider staff working directly with applicants or recipients of benefits such as Medicaid and SNAP that NYC DSS offers. NYC DSS anticipates that due to the vague and confusing nature of the Final Rule and Policy Alert, all staff that work directly with applicants or recipients are likely to receive questions about public charge and will need to receive training. Additionally, NYC Mayor's Office of Immigrant Affairs had to use substantial resources to combat the 2019 Rule's chilling effect during the COVID period and likewise will need to do the same here to address the confusion from the ambiguity and flawed nature of the Final Rule and Policy Alert.

291. San Francisco will also devote significant city resources and employee time to address the effects of the Final Rule and Policy Alert. The Final Rule and Policy Alert have exacerbated fear and distrust among individuals accessing City services and has thus increased the barriers that staff must overcome in order to connect immigrant residents with necessary services. For example, a recent multiple-year long outreach pilot program conducted by San Francisco's Human Services Agency identified public charge as an ongoing area of significant concern and confusion for immigrant clients. SFHSA estimates that the department would need to spend over a thousand hours training the approximately 500 staff responsible for handling public benefits like SNAP and Medicaid. Likewise, San Francisco's Department of Public Health will need to provide

specific training about the Final Rule and Policy Alert to 350 staff who perform Medicaid screening and eligibility, 150 staff conducting other patient-facing activities, and approximately 80 managers and supervisors. And the department also expects to provide basic education about the Final Rule and Policy Alert to all 6,500 staff across SFDPH-run clinics and hospitals, and community-based clinics that contract with the department.

292. Public Health – Seattle & King County anticipates having to provide training to over 350 benefit enrollment navigators and over 500 patient-facing staff regarding the Final Rule and Policy Alert. Additionally, PHSKC anticipates difficulty forecasting workload, a need to divert staff resources to educate the public and respond to questions and concerns, and a need to manage high volumes of sudden case closures.

293. The Final Rule either fails to consider or fails to adequately address the foregoing harms, dismissing them in a conclusory, arbitrary, and capricious manner.

**FIRST CAUSE OF ACTION**

**(Administrative Procedure Act—Contrary to Law and Exceeds Statutory Authority)**

294. Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

295. Under the APA, courts must "hold unlawful and set aside" agency action that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

296. Under the APA, courts must also "set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

297. DHS and USCIS are "agencies" under the APA, 5 U.S.C. § 551(1), and the Final Rule and Policy Alert each constitute a final agency action subject to review under the APA.

298. Defendants may only exercise authority conferred by statute. *City of Arlington v. FCC*, 569 U.S. 290, 297–98 (2013).

299. In interpreting statutes, courts exercise independent judgment rather than defer to administrative agencies' interpretations. *Loper Bright Enterprises*, 603 U.S. at 391–92.

300. The Final Rule and Policy Alert are contrary to law and exceed statutory authority for the reasons described above. The Final Rule and Policy Alert effectuate a radical change to the definition of "public charge" that conflicts with the term's plain meaning, congressional intent, statutory context, longstanding administrative interpretation, history, and case law, including multiple federal appellate decisions.

301. The Final Rule and Policy Alert disregard that the statutory term "public charge" has a longstanding and established meaning: being primarily dependent on the government for subsistence. In its place, the Final Rule and the Policy Alert provide that "public charge" could include persons who receive *any* means-tested public benefits and fail to provide clear limits. These changes leave both the definition of public charge and the process of determining who is a public charge, unbounded in a manner not authorized by the relevant federal statutes.

302. The Final Rule and Policy Alert unlawfully conflate their incorrect interpretation of PRWORA with the definition of "public charge" in INA Section 212(a)(4).

303. The Final Rule and Policy Alert conflict with the SNAP statute, which provides that "[t]he value of benefits that may be provided under this chapter shall not be considered income or resources for any purpose under any Federal, State, or local laws, including, but not limited to, laws relating to taxation, welfare, and public assistance program." 7 U.S.C. § 2017(b). The Final Rule and Policy Alert are also in tension with the statutory exemptions from the term "means-tested public benefits" for purposes of sponsor affidavits. *See* 8 U.S.C. § 1183a note.

304. The Final Rule and Policy Alert are therefore not in accordance with law and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," in violation of the APA. 5 U.S.C. §§ 706(2)(A), (C).

305. Defendants' violations caused and are causing ongoing harm to Plaintiffs.

**SECOND CAUSE OF ACTION**

**(Administrative Procedure Act—Arbitrary and Capricious)**

306. Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

307. The APA provides that courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

308. DHS and USCIS are "agencies" under the APA, 5 U.S.C. § 551(1), and the Final Rule and the Policy Alert constitute final agency actions subject to review under the APA.

309. An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle*, 463 U.S. at 43 (citation modified). Moreover, although "[a]gencies are free to change their existing policies," they must "'provide a reasoned explanation for the change,' 'display awareness that [they are] changing position,' and 'consider serious reliance interests.'" *FDA v. Wages & White Lion Invs.,* 604 U.S. 542, 544 (2025) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016)).

310. The Final Rule and Policy Alert are arbitrary and capricious for the reasons discussed above, *see supra* at ¶¶ 107–161, including because Defendants rescind clear regulatory text and replace it with an overly broad framework that fails to provide meaningful guardrails.

Defendants provide this open-ended framework without reasoned explanation, do not rationally connect DHS's conclusion to the facts, and disregard material facts and evidence. The Final Rule and Policy Alert are also internally inconsistent and counter to the evidence before DHS.

311. The Final Rule and Policy Alert are arbitrary and capricious because Defendants fail to reasonably justify their departure from decades of settled practice with respect to the scope and definition of the term "public charge" and to the public charge determination process, which would allow for the consideration of information not shown to be a predictor of becoming primarily dependent on the government for subsistence.

312. The Final Rule and Policy Alert are also arbitrary and capricious because they fail to adequately consider their retroactive effects. *See Bowen*, 488 U.S. at 220 (Scalia, J., concurrence); *see generally Landgraf*, 511 U.S. at 290. Certain means-tested public benefits cannot be "disenrolled" from, and many other programs only offer opportunities to disenroll on an annual basis. The Final Rule and Policy Alert "take[] away or impair[] vested rights" and "attach[] a new disability in respect to . . . considerations already past." *Nat'l Mining Ass'n*, 177 F.3d at 8. The Final Rule and Policy Alert have secondary retroactivity that alters the future "in a manner that makes worthless substantial past investment incurred in reliance upon the prior rule." *Bowen*, 488 U.S. at 220 (Scalia, J., concurrence). Because the Final Rule and Policy Alert operate retroactively, and fail to recognize or consider their retroactive impacts, the Final Rule and Policy Alert are arbitrary and capricious.

313. Defendants have acted arbitrarily and capriciously because they do not adequately consider the extent of the harm the Final Rule and Policy Alert will cause to vulnerable populations, including children. Defendants fail to adequately quantify the harm to public health and state and local economies, and the financial and administrative burdens on Plaintiffs and other

localities. Moreover, Defendants fail to adequately consider the serious reliance interests of Plaintiffs, their residents, their communities, and individuals and families around the country.

314. The Final Rule and Policy Alert are arbitrary and capricious because they rely on incorrect legal interpretations of case law and administrative interpretation.

315. The Final Rule and Policy Alert are therefore "arbitrary, capricious, [or] an abuse of discretion" in violation of the APA. 5 U.S.C. § 706(2)(A).

316. Defendants' violations caused and are causing ongoing harm to Plaintiffs.

**THIRD CAUSE OF ACTION**

**(Administrative Procedure Act— Failure to Comply with Notice-and-Comment Requirements)**

317. Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

318. Under the APA, when agencies are promulgating substantive and legislative rules, they are required to provide notice of proposed rulemaking and an opportunity for interested persons to participate through submission of written data, views, and arguments. 5 U.S.C. § 553(b)-(c). The APA further provides that courts must "hold unlawful and set aside" agency action taken without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

319. DHS and USCIS are "agencies" under the APA, 5 U.S.C. § 551(1), and the Policy Alert constitutes final agency action subject to review under the APA.

320. Defendants did not publish the Policy Alert as a proposed rule or provide Plaintiffs or other interested members of the public with notice and an opportunity to comment before its issuance.

321. Although Defendants label the Policy Alert as "guidance," it is legislative or substantive in nature to the extent it imposes new rights, obligations, or consequences,

substantively amends an existing regulatory regime, or otherwise has the force and effect of law with respect to applicants and sponsors, immigration officers, and others. *See, e.g.*, *City of Billings v. Transp. Sec. Admin.*, 153 F.4th 46 (D.C. Cir. 2025); *Mayor & City Council of Baltimore v. Trump*, 416 F. Supp. 3d 452 (D. Md. 2019). To the extent Defendants promulgated and implemented a legislative rule without observing the necessary procedures, including those required by the APA, they violated 5 U.S.C. §§ 553 and 706(2)(D).

322. Defendants' actions caused and will continue causing ongoing harm to Plaintiffs.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that this Court:

1. Declare that the Final Rule and Policy Alert are not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A) and are in excess of DHS's and USCIS's statutory jurisdiction, authority, or limitations, or short of statutory right within the meaning of 5 U.S.C. § 706(2)(C);

2. Declare that the Final Rule and Policy Alert are arbitrary, capricious, and an abuse of discretion within the meaning of 5 U.S.C. § 706(2)(A);

3. Declare that the Policy Alert was promulgated without observance of procedure required by law, including the notice-and-comment requirements of 5 U.S.C. § 553 and the meaning of 5 U.S.C. § 706(2)(D);

4. Vacate and set aside the Final Rule and the Policy Alert;

5. Permanently enjoin Defendants and all of their officers, employees, and agents, and anyone acting in concert with them, from implementing, applying, or taking any action whatsoever under the Final Rule and the Policy Alert;

6. Permanently enjoin Defendants from retaliating against any Plaintiff for participating in this lawsuit or taking any adverse action based on any Plaintiff's participation in this lawsuit;

7. Award Plaintiffs their reasonable attorneys' fees and costs; and

8. Grant other such relief as this Court may deem proper.

Dated: New York, New York
September 14, 2026

Respectfully submitted,

**CITY OF NEW YORK**

STEVEN BANKS
*Corporation Counsel of the City of New York*

By: /s/ *Hope Y. Lu*
HOPE Y. LU
Senior Counsel for Complex & Strategic Litigation
DORIS BERNHARDT
ELIZABETH SLATER
SAIENA SHAFIEZADEH
Senior Counsels
MELANIE C. T. ASH
Deputy Chief
Office of the Corporation Counsel for the City of New York
100 Church Street
New York, New York 10007
(212) 356-1642
hlu@law.nyc.gov
dbernhar@law.nyc.gov
eslater@law.nyc.gov
sashafie@law.nyc.gov
mash@law.nyc.gov
*Attorneys for Plaintiff City of New York*

**COUNTY OF SANTA CLARA**

TONY LOPRESTI*
*County Counsel for the County of Santa Clara*

By: /s/ *Tony LoPresti*
TONY LOPRESTI*
County Counsel
KAVITA NARAYAN*
Chief Assistant County Counsel
MEREDITH A. JOHNSON*
Lead Deputy County Counsel
RAPHAEL N. RAJENDRA*

Deputy County Counsel
LEILY ARZY*
Social Justice and Impact Litigation Fellow
Office of the County Counsel
County of Santa Clara
70 West Hedding Street, East Wing, 9th Fl.
San José, CA 95110-1770
(408) 299-5900
kavita.narayan@cco.sccgov.org
meredith.johnson@cco.sccgov.org
raphael.rajendra@cco.sccgov.org
leily.arzy@cco.sccgov.org

* Motion forthcoming for admission *pro hac vice*

*Attorneys for Plaintiff County of Santa Clara*

**CITY AND COUNTY OF SAN FRANCISCO**

DAVID CHIU*
*City Attorney for the City and County of San Francisco*

By: /s/ *David Chiu*
DAVID CHIU*
City Attorney
YVONNE R. MERÉ*
Chief Deputy City Attorney
SARA J. EISENBERG*
Chief of Complex and Affirmative Litigation
KARUN TILAK*
CARA R. MEYER*
Deputy City Attorneys
Fox Plaza
1390 Market Street, 7th Floor
San Francisco, California 94102-508
(415) 355-3308
yvonne.mere@sfcityatty.org
sara.eisenberg@sfcityatty.org
karun.tilak@sfcityatty.org
cara.meyer@sfcityatty.org

*Motion forthcoming for admission *pro hac vice*

*Attorneys for Plaintiff City and County of San Francisco*

**MARTIN LUTHER KING, JR. COUNTY**

LEESA MANION
King County Prosecuting Attorney

By: /s/ *Cristy J. Craig*
CRISTY J. CRAIG*, WA Bar No. 27451
Senior Deputy Prosecuting Attorney
CHRISTOPHER M. SANDERS*, WA Bar No. 47518
Chief Legal Officer & General Counsel for King County Executive Girmay Zahilay
701 Fifth Avenue, Ste 600
Seattle, Washington 98104
(206) 477-1120
chrsanders@kingcounty.gov
cristy.craig@kingcounty.gov

*Motion forthcoming for admission *pro hac vice*

*Counsel for Plaintiff Martin Luther King, Jr. County*

**CITY OF CHICAGO**

By: /s/ *Katherine Hubbard*
KATHERINE HUBBARD (DC Bar No. 1500503)*
Managing Attorney
NAOMI TSU (Oregon Bar No. 242511)*††
Senior Staff Attorney
KAYLA SVIHOVEC (S.D.N.Y Bar No. pending)†
Staff Attorney
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
Telephone: (510) 738-6788
katherine.hubbard@publicrightsproject.org
naomi.tsu@publicrightsproject.org
kayla.svihovec@publicrightsproject.org

*Motion forthcoming for admission *pro hac vice*

†Admitted to SDNY pending swearing in
Admitted in DC. Not admitted in California.
††Admitted in Oregon and Georgia. Admitted but not active in California.

*Counsel for Plaintiff City of Chicago*

**CITY OF SEATTLE**

ERIKA J. EVANS*
Seattle City Attorney

By: /s/ *Ghazal Sharifi*
GHAZAL SHARIFI, WSBA# 47750*
Section Director
Constitutional and Complex Litigation Section
NATASHA R. KHANNA, WSBA# 52870*
Assistant City Attorney
REBECCA S. COHEN, WSBA# 31767*
Civil Division Chief
Assistant City Attorneys
Seattle City Attorney's Office
701 Fifth Avenue, Suite 2050
Seattle, WA 98104
Phone: (206) 684-8200
Ghazal.Sharifi@seattle.gov
Natasha.Khanna@seattle.gov
Becca.Cohen@seattle.gov

*Motion forthcoming for admission *pro hac vice*

By: /s/ *Katherine Hubbard*
KATHERINE HUBBARD (DC Bar No. 1500503)*
Managing Attorney
NAOMI TSU (Oregon Bar No. 242511)*††
Senior Staff Attorney
KAYLA SVIHOVEC (S.D.N.Y Bar No. pending)†
Staff Attorney
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
Telephone: (510) 738-6788

katherine.hubbard@publicrightsproject.org
naomi.tsu@publicrightsproject.org
kayla.svihovec@publicrightsproject.org

*Motion forthcoming for admission *pro hac vice*

†Admitted to SDNY pending swearing in
Admitted in DC. Not admitted in California.
††Admitted in Oregon and Georgia. Admitted but not active in California.

*Counsel for Plaintiff City of Seattle*